JOHN DEN, *ex dem.* JAMES B. MURRAY AND JOHN C. KAYSER, PLAINTIFFS, *v.* THE HOBOKEN LAND AND IMPROVEMENT COMPANY. JOHN DEN, *ex dem.* JAMES B. MURRAY ET AL. *v.* THE HOBOKEN LAND AND IMPROVEMENT COMPANY. JOHN DEN, *ex dem.* WILLIAM P. RATHBONE ET AL. *v.* RUTSEN SUCKLEY ET AL.

A distress warrant, issued by the solicitor of the treasury under the act of congress passed on the 15th May, 1820, (3 Stats. at Large, 592,) is not inconsistent with the constitution of the United States.

It was an exercise of executive and not of judicial power, according to the meaning of those words in the constitution; and the privilege allowed to a collector to bring the question of his indebtedness before the courts of the United States, is merely the consent of congress to the suit, which is given in other classes of cases also.

Neither is it inconsistent with that part of the constitution which prohibits a citizen from being deprived of his liberty or property without due process of law. The historical and critical meaning of these words examined.

By the common law of England and the laws of many of the colonies before the revolution, and of States before the formation of the federal constitution, a summary process existed for the recovery of debts due to the government.

It does not necessarily follow that the adjustment of these balances is a controversy to which the United States is a party, within the meaning of the constitution.

Under the power of congress to collect taxes and the exercise of that power by the act above mentioned, the warrant of distress is conclusive evidence of the facts recited in it and of the authority to make the levy, so far as to justify the marshal in making it; but the question of indebtedness may be the subject of a suit, congress having assented thereto, and the levy may provide security for the event of the suit.

The article of the constitution, requiring an oath or affirmation for a warrant, has no application to proceedings for the recovery of debts, where no search warrant is used.

The return of the marshal that he had levied on lands, by virtue of such a warrant, is, at least, *primâ facie* evidence that the levy was not irregular by reason of the existence of goods and chattels of the collector subject to his process.

THESE three cases came up from the circuit court of the United States for the district of New Jersey, upon a certificate of division in opinion between the judges thereof.

As the opinion of the court answers only the third question, it may be proper to say that the first two related to a mortgage executed by Henry Ogden, as the attorney in fact of Swartwout, to Henry D. Gilpin, solicitor of the treasury. It was necessary to the case of the plaintiffs to get rid of this mortgage in the first instance, and afterwards to avoid the sale under the distress warrant. If they failed in the last, the points raised in the first two questions became of no practical consequence, and, therefore, answers to them were not returned by this court.

The case is stated in the opinion of the court. The decision of one involved the two others, as they depended upon the same principles.

It was argued by *Mr. Van Winkle* and *Mr. Wood*, for the plaintiffs, and by *Mr. Zabrinski, Mr. Gillett, Mr. Butler,* and *Mr. Bradley*, for the defendants.

Murray's Lessee et al. *v.* Hoboken Land and Improvement Co.

The points relating to the power of attorney and the mortgage need not be noticed.

The counsel for the plaintiffs contended that the acts of congress, authorizing these proceedings under a distress warrant, were unconstitutional and void, because,—

The proceeding to establish this claim was, in its nature, a judicial proceeding, and could only be carried out under the judicial power. Const. U. S. art. 3, §§ 1, 2; 4 Devereux, 1, 13.

By the judicial power in the constitution, was meant that portion of such power which was recognized and understood to be such at the time of the adoption of the constitution. Federalist, No. 80; 2 Brock. 447.

This summary proceeding was considered and enforced as a judgment at law. 3 Wheat. 212, 222.

The warrant to sell and imprison is an execution issued upon a judgment. 9 Pet. 8.

The secretary of the treasury cannot be constituted a court for the exercise of judicial power. Const. U. S. art. 3, § 1.

The power of review of law and fact, given by the act to a court, does not change these views.

The proceeding in question took place without any hearing by the debtor and without a trial by jury, and is, therefore, unconstitutional and void. Article 7 of Amendments to Constitution; 5 Johns. 37.

As process, it was unconstitutional, because it changed the *onus*, and required the debtor to disprove the debt.

This process deprives of liberty and property without due process of law, contrary to the 5th article of amendments to the constitution.

This meant, by process of law, as then understood, charge, defence, judgment before and by a legally constituted court. Co. Lit. 2 Inst. 47, Magna Charta, chs. 8 and 29; 2 Kent's Com. (5th Ed.) 13; Story on the Const. § 1783; Sullivan's Lectures, chs. 39 and 40; Taylor *v.* Porter, 4 Hill, 146; Fletcher *v.* Peck, 6 Cranch, 138; Bank of Col. *v.* Oakley, 4 Pet. Cond. R. 443; 4 Cranch, 439; Van Zandt *v.* Waddell, 2 Yerger, 260; Jones's Heirs *v.* Perry et al. 10 ibid. 59; Bank of the State *v.* Charles Cooper et al, 2 ibid. 599; Lane *v.* Dorman, 3 Scam. 238, 241; White *v.* White, 5 Barbour's S. C. R. 481–483; Holden *v.* James, 11 Mass. 404.

No implied or express consent can make valid what is unconstitutional.

The distress warrant was not supported by oath or affirmation. Amendments to Constitution, article 4.

If the proceeding is constitutional, still, the statute must be

strictly pursued.   6 Pet. 470 ; 3 ibid. 8 ; 1 Scam. 323 ; 6 Wheat. 119.

But it does not appear that there were no goods or chattels upon which to levy; on the contrary, that the marshal levied upon some, but failed to sell them.

The counsel for the defendants contended :—

That these proceedings were not judicial acts.   That they were the well-known proceeding by distress, established at common law, and regulated by statute in most of the States before the adoption of the federal constitution.   3 Black. Com. 3, 6.

Prior acts of congress regulated distress warrants.   3 Stats. at Large, 173, §§ 26, 14.

They have none of the characteristics of judicial proceedings. 1 Curt. Com. 99 ; 13 How. 40.

This court has laid down the distinction between the judicial power intended by the constitution, and this power conferred upon a particular officer.   8 Pet. 8 ; 6 ibid. 47 ; 13 How. 4, 52, note.

Mr. Justice CURTIS delivered the opinion of the court.

This case comes before us on a certificate of division of opinion of the judges of the circuit court of the United States for the district of New Jersey.   It is an action of ejectment, in which both parties claim title under Samuel Swartwout—the plaintiffs, under the levy of an execution on the 10th day of April, 1839, and the defendants, under a sale made by the marshal of the United States for the district of New Jersey, on the 1st day of June, 1839—by virtue of what is denominated a distress warrant, issued by the solicitor of the treasury under the act of congress of May 15, 1820, entitled, " An act providing for the better organization of the treasury department."   This act having provided, by its first section, that a lien for the amount due should exist on the lands of the debtor from the time of the levy and record thereof in the office of the district court of the United States for the proper district, and the date of that levy in this case being prior to the date of the judgment under which the plaintiffs' title was made, the question occurred in the circuit court, " whether the said warrant of distress in the special verdict mentioned, and the proceedings thereon and anterior thereto, under which the defendants claim title, are sufficient, under the constitution of the United States and the law of the land, to pass and transfer the title and estate of the said Swartwout in and to the premises in question, as against the lessors of the plaintiff."   Upon this question, the judges being of opposite opinions, it was certified to this court, and has been argued by counsel.

No objection has been taken to the warrant on account of any defect or irregularity in the proceedings which preceded its issue. It is not denied that they were in conformity with the requirements of the act of congress. The special verdict finds that Swartwout was collector of the customs for the port of New York for eight years before the 29th of March, 1838: that, on the 10th of November, 1838, his account, as such collector, was audited by the first auditor, and certified by the first comptroller of the treasury; and for the balance thus found, amounting to the sum of $1,374,119 $\frac{65}{100}$, the warrant in question was issued by the solicitor of the treasury. Its validity is denied by the plaintiffs, upon the ground that so much of the act of congress as authorized it, is in conflict with the constitution of the United States.

In support of this position, the plaintiff relies on that part of the first section of the third article of the constitution which requires the judicial power of the United States to be vested in one supreme court and in such inferior courts as congress may, from time to time, ordain and establish; the judges whereof shall hold their offices during good behavior, and shall, at stated times, receive for their services a compensation, which shall not be diminished during their continuance in office. Also, on the second section of the same article, which declares that the judicial power shall extend to controversies to which the United States shall be a party.

It must be admitted that, if the auditing of this account, and the ascertainment of its balance, and the issuing of this process, was an exercise of the judicial power of the United States, the proceeding was void; for the officers who performed these acts could exercise no part of that judicial power. They neither constituted a court of the United States, nor were they, or either of them, so connected with any such court as to perform even any of the ministerial duties which arise out of judicial proceedings.

The question, whether these acts were an exercise of the judicial power of the United States, can best be considered under another inquiry, raised by the further objection of the plaintiff, that the effect of the proceedings authorized by the act in question is to deprive the party, against whom the warrant issues, of his liberty and property, " without due process of law;" and, therefore, is in conflict with the fifth article of the amendments of the constitution.

Taking these two objections together, they raise the questions, whether, under the constitution of the United States, a collector of the customs, from whom a balance of account has been found to be due by accounting officers of the treasury, designated for that purpose by law, can be deprived of his liberty, or property,

in order to enforce payment of that balance, without the exercise of the judicial power of the United States, and yet by due process of law, within the meaning of those terms in the constitution ; and if so, then, secondly, whether the warrant in question was such due process of law ?

The words, " due process of law," were undoubtedly intended to convey the same meaning as the words, " by the law of the land," in *Magna Charta.* Lord Coke, in his commentary on those words, (2 Inst. 50,) says they mean due process of law. The constitutions which had been adopted by the several States before the formation of the federal constitution, following the language of the great charter more closely, generally contained the words, " but by the judgment of his peers, or the law of the land." The ordinance of congress of July 13, 1787, for the government of the territory of the United States northwest of the River Ohio, used the same words.

The constitution of the United States, as adopted, contained the provision, that " the trial of all crimes, except in cases of impeachment, shall be by jury." When the fifth article of amendment containing the words now in question was made, the trial by jury in criminal cases had thus already been provided for. By the sixth and seventh articles of amendment, further special provisions were separately made for that mode of trial in civil and criminal cases. To have followed, as in the state constitutions, and in the ordinance of 1787, the words of *Magna Charta,* and declared that no person shall be deprived of his life, liberty, or property but by the judgment of his peers or the law of the land, would have been in part superfluous and inappropriate. To have taken the clause, " law of the land," without its immediate context, might possibly have given rise to doubts, which would be effectually dispelled by using those words which the great commentator on *Magna Charta* had declared to be the true meaning of the phrase, " law of the land," in that instrument, and which were undoubtedly then received as their true meaning.

That the warrant now in question is legal process, is not denied. It was issued in conformity with an act of Congress. But is it " due process of law ?" The constitution contains no description of those processes which it was intended to allow or forbid. It does not even declare what principles are to be applied to ascertain whether it be due process. It is manifest that it was not left to the legislative power to enact any process which might be devised. The article is a restraint on the legislative as well as on the executive and judicial powers of the government, and cannot be so construed as to leave congress free to make any process " due process of law," by its mere will. To what principles, then, are we to resort to ascertain whether

this process, enacted by congress, is due process? To this the answer must be twofold. We must examine the constitution itself, to see whether this process be in conflict with any of its provisions. If not found to be so, we must look to those settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country. We apprehend there has been no period, since the establishment of the English monarchy, when there has not been, by the law of the land, a summary method for the recovery of debts due to the crown, and especially those due from receivers of the revenues. It is difficult, at this day, to trace with precision all the proceedings had for these purposes in the earliest ages of the common law. That they were summary and severe, and had been used for purposes of oppression, is inferable from the fact that one chapter of *Magna Charta* treats of their restraint. It declares: " We or our bailiffs shall not seize any land or rent for any debt as long as the present goods and chattels of the debtor do suffice to pay the debt, and the debtor himself be ready to satisfy therefor. Neither shall the pledges of the debtor be distrained, as long as the principal debtor is sufficient for the payment of the debt; and if the principal debtor fail in payment of the debt, having nothing wherewith to pay, or will not pay where he is able, the pledges shall answer for the debt. And if they will, they shall have the lands and rents of the debtor until they be satisfied of the debt which they before paid for him, except that the principal debtor can show himself to be acquitted against the said sureties."

By the common law, the body, lands, and goods of the king's debtor were liable to be levied on to obtain payment. In conformity with the above provision of *Magna Charta*, a conditional writ was framed, commanding the sheriff to inquire of the goods and chattels of the debtor, and, if they were insufficient, then to extend on the lands. 3 Co. 12 b; Com. Dig., Debt, G. 2; 2 Inst. 19. But it is said that since the statute 33 Hen. VIII. c. 39, the practice has been to issue the writ in an absolute form, without requiring any previous inquisition as to the goods. Gilbert's Exch. 127.

To authorize a writ of extent, however, the debt must be matter of record in the king's exchequer. The 33 Hen. VIII. c. 39, § 50, made all specialty debts due to the king of the same force and effect as debts by statute staple, thus giving to such debts the effect of debts of record. In regard to debts due upon simple contract, other than those due from collectors of the revenue and other accountants of the crown, the practice, from very an-

cient times, has been to issue a commission to inquire as to the existence of the debt.

This commission being returned, the debt found was thereby evidenced by a record, and an extent could issue thereon. No notice was required to be given to the alleged debtor of the execution of this commission, (2 Tidd's Pr. 1047,) though it seems that, in some cases, an order for notice might be obtained. 1 Ves. 269. Formerly, no witnesses were examined by the commission, (Chitty's Prerog. 267; West, 22;) the affidavit prepared to obtain an order for an immediate extent being the only evidence introduced. But this practice has been recently changed. 11 Price, 29. By the statute 13 Eliz. ch. 4, balances due from receivers of the revenue and all other accountants of the crown were placed on the same footing as debts acknowledged to be due by statute staple. These balances were found by auditors, the particular officers acting thereon having been, from time to time, varied by legislation and usage. The different methods of accounting in ancient and modern times are described in Mr. Price's Treatise on the Law and Practice of the Exchequer, ch. 9. Such balances, when found, were certified to what was called the pipe office, to be given in charge to the sheriffs for their levy. Price, 231.

If an accountant failed to render his accounts, a process was issued, termed a *capias nomine districtionis*, against the body, goods, and lands of the accountant. Price, 162, 233, note 3.

This brief sketch of the modes of proceeding to ascertain and enforce payment of balances due from receivers of the revenue in England, is sufficient to show that the methods of ascertaining the existence and amount of such debts, and compelling their payment, have varied widely from the usual course of the common law on other subjects; and that, as respects such debts due from such officers, " the law of the land" authorized the employment of auditors, and an inquisition without notice, and a species of execution bearing a very close resemblance to what is termed a warrant of distress in the act of 1820, now in question.

It is certain that this diversity in " the law of the land" between public defaulters and ordinary debtors was understood in this country, and entered into the legislation of the colonies and provinces, and more especially of the States, after the declaration of independence and before the formation of the constitution of the United States. Not only was the process of distress in nearly or quite universal use for the collection of taxes, but what was generally termed a warrant of distress, running against the body, goods, and chattels of defaulting receivers of public money, was issued to some public officer, to whom was com-

mitted the power to ascertain the amount of the default, and by such warrant proceed to collect it. Without a wearisome repetition of details, it will be sufficient to give one section from the Massachusetts act of 1786 : " That if any constable or collector, to whom any tax or assessment shall be committed to collect, shall be remiss and negligent of his duty, in not levying and paying unto the treasurer and receiver-general such sum or sums of money as he shall from time to time have received, and as ought by him to have been paid within the respective time set and limited by the assessor's warrant, pursuant to law, the treasurer and receiver-general is hereby empowered, after the expiration of the time so set, by warrant under his hand and seal, directed to the sheriff or his deputy, to cause such sum and sums of money to be levied by distress and sale of such deficient constable or collector's estate, real and personal, returning the overplus, if any there be ; and, for want of such estate, to take the body of such constable or collector, and imprison him until he shall pay the same; which warrant the sheriff or his deputy is hereby empowered and required to execute accordingly." Then follows another provision, that if the deficient sum shall not be made by the first warrant, another shall issue against the town; and if its proper authorities shall fail to take the prescribed means to raise and pay the same, a like warrant of distress shall go against the estates and bodies of the assessors of such town. Laws of Massachusetts, vol. i. p. 266. Provisions not distinguishable from these in principle may be found in the acts of Connecticut, (Revision of 1784, p. 198;) of Pennsylvania, 1782, (2 Laws of Penn. 13;) of South Carolina, 1788, (5 Stats. of S. C. 55;) New York, 1788, (1 Jones & Varick's Laws, 34;) see also 1 Henning's Stats. of Virginia, 319, 343; 12 Ibid. 562; Laws of Vermont, (1797, 1800,) 340. Since the formation of the constitution of the United States, other States have passed similar laws. See 7 Louis. An. R. 192. Congress, from an early period, and in repeated instances, has legislated in a similar manner. By the fifteenth section of the "Act to lay and collect a direct tax within the United States," of July 14, 1798, the supervisor of each district was authorized and required to issue a warrant of distress against any delinquent collector and his sureties, to be levied upon the goods and chattels, and for want thereof upon the body of such collector; and, failing of satisfaction thereby; upon the goods and chattels of the sureties. 1 Stats. at Large, 602. And again, in 1813, (3 Stats. at Large, 33, § 28,) and 1815, (3 Stats. at Large, 177, § 33,) the comptroller of the treasury was empowered to issue a similar warrant against collectors of the customs and their sureties. This legislative construction of the constitution, commencing so early in the government,

when the first occasion for this manner of proceeding arose, continued throughout its existence, and repeatedly acted on by the judiciary and the executive, is entitled to no inconsiderable weight upon the question whether the proceeding adopted by it was "due process of law." Prigg v. Pennsylvania, 16 Pet. 621; United States v. Nourse, 9 Pet. 8; Randolph's case, 2 Brock. 447; Nourse's case, 4 Cranch, C. C. R. 151; Bullock's case, (cited 6 Pet. 485, note.)

Tested by the common and statute law of England prior to the emigration of our ancestors, and by the laws of many of the States at the time of the adoption of this amendment, the proceedings authorized by the act of 1820 cannot be denied to be due process of law, when applied to the ascertainment and recovery of balances due to the government from a collector of customs, unless there exists in the constitution some other provision which restrains congress from authorizing such proceedings. For, though "due process of law" generally implies and includes *actor*, *reus*, *judex*, regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings, (2 Inst. 47, 50; Hoke v. Henderson, 4 Dev. N. C. Rep. 15; Taylor v. Porter, 4 Hill, 146; Van Zandt v. Waddel, 2 Yerger, 260; State Bank v. Cooper, Ibid. 599; Jones's Heirs v. Perry, 10 Ibid. 59; Greene v. Briggs, 1 Curtis, 311,) yet, this is not universally true. There may be, and we have seen that there are cases, under the law of England after *Magna Charta*, and as it was brought to this country and acted on here, in which process, in its nature final, issues against the body, lands, and goods of certain public debtors without any such trial; and this brings us to the question, whether those provisions of the constitution which relate to the judicial power are incompatible with these proceedings?

That the auditing of the accounts of a receiver of public moneys may be, in an enlarged sense, a judicial act, must be admitted. So are all those administrative duties the performance of which involves an inquiry into the existence of facts and the application to them of rules of law. In this sense the act of the President in calling out the militia under the act of 1795, 12 Wheat. 19, or of a commissioner who makes a certificate for the extradition of a criminal, under a treaty, is judicial. But it is not sufficient to bring such matters under the judicial power, that they involve the exercise of judgment upon law and fact. United States v. Ferreira, 13 How. 40. It is necessary to go further, and show not only that the adjustment of the balances due from accounting officers may be, but from their nature must be, controversies to which the United States is a party, within the meaning of the second section of the third article of the

constitution. We do not doubt the power of congress to provide by law that such a question shall form the subject-matter of a suit in which the judicial power can be exerted. The act of 1820 makes such a provision for reviewing the decision of the accounting officers of the treasury. But, until reviewed, it is final and binding; and the question is, whether its subject-matter is necessarily, and without regard to the consent of congress, a judicial controversy. And we are of opinion it is not.

Among the legislative powers of congress are the powers " to lay and collect taxes, duties, imposts, and excises; to pay the debts, and provide for the common defence and welfare of the United States, to raise and support armies; to provide and maintain a navy, and to make all laws which may be necessary and proper for carrying into execution those powers." What officers should be appointed to collect the revenue thus authorized to be raised, and to disburse it in payment of the debts of the United States; what duties should be required of them; when and how, and to whom they should account, and what security they should furnish, and to what remedies they should be subjected to enforce the proper discharge of their duties, congress was to determine. In the exercise of their powers, they have required collectors of customs to be appointed; made it incumbent on them to account, from time to time, with certain officers of the treasury department, and to furnish sureties, by bond, for the payment of all balances of the public money which may become due from them. And by the act of 1820, now in question, they have undertaken to provide summary means to compel these officers—and in case of their default, their sureties—to pay such balances of the public money as may be in their hands.

The power to collect and disburse revenue, and to make all laws which shall be necessary and proper for carrying that power into effect, includes all known and appropriate means of effectually collecting and disbursing that revenue, unless some such means should be forbidden in some other part of the constitution. The power has not been exhausted by the receipt of the money by the collector. Its purpose is to raise money and use it in payment of the debts of the government; and, whoever may have possession of the public money, until it is actually disbursed, the power to use those known and appropriate means to secure its due application continues.

As we have already shown, the means provided by the act of 1820, do not differ in principle from those employed in England from remote antiquity—and in many of the States, so far as we know without objection—for this purpose, at the time the con-

24*

stitution was formed. It may be added, that probably there are few governments which do or can permit their claims for public taxes, either on the citizen or the officer employed for their collection or disbursement, to become subjects of judicial controversy, according to the course of the law of the land. Imperative necessity has forced a distinction between such claims and all others, which has sometimes been carried out by summary methods of proceeding, and sometimes by systems of fines and penalties, but always in some way observed and yielded to.

It is true that in England all these proceedings were had in what is denominated the court of exchequer, in which Lord Coke says, 4 Inst. 115, the barons are the sovereign auditors of the kingdom. But the barons exercise in person no judicial power in auditing accounts, and it is necessary to remember that the exchequer includes two distinct organizations, one of which has charge of the revenues of the crown, and the other has long been in fact, and now is for all purposes, one of the judicial courts of the kingdom, whose proceedings are and have been as distinct, in most respects, from those of the revenue side of the exchequer, as the proceedings of the circuit court of this district are from those of the treasury; and it would be an unwarrantable assumption to conclude that, because the accounts of receivers of revenue were settled in what was denominated the court of exchequer, they were judicial controversies between the king and his subjects, according to the ordinary course of the common law or equity. The fact, as we have already seen, was otherwise.

It was strongly urged by the plaintiff's counsel, that though the government might have the rightful power to provide a summary remedy for the recovery of its public dues, aside from any exercise of the judicial power, yet it had not done so in this instance. That it had enabled the debtor to apply to the judicial power, and having thus brought the subject-matter under its cognizance, it was not for the government to say that the subject-matter was not within the judicial power. That if it were not in its nature a judicial controversy, congress could not make it such, nor give jurisdiction over it to the district courts. In short, the argument is, that if this were not, in its nature, a judicial controversy, congress could not have conferred on the district court power to determine it upon a bill filed by the collector. If it be such a controversy, then it is subject to the judicial power alone; and the fact that congress has enabled the district court to pass upon it, is conclusive evidence that it is a judicial controversy.

We cannot admit the correctness of the last position. If we

were of opinion that this subject-matter cannot be the subject of a judicial controversy, and that, consequently, it cannot be made a subject of judicial cognizance, the consequence would be, that the attempt to bring it under the jurisdiction of a court of the United States would be ineffectual. But the previous proceedings of the executive department would not necessarily be affected thereby. They might be final, instead of being subject to judicial review.

But the argument leaves out of view an essential element in the case, and also assumes something which cannot be admitted.

It assumes that the entire subject-matter is or is, not, in every mode of presentation, a judicial controversy, essentially and in its own nature, aside from the will of congress to permit it to be so; and it leaves out of view the fact that the United States is a party.

It is necessary to take into view some settled rules.

Though, generally, both public and private wrongs are redressed through judicial action, there are more summary extra-judicial remedies for both. An instance of extra-judicial redress of a private wrong is, the recapture of goods by their lawful owner; of a public wrong, by a private person, is the abatement of a public nuisance; and the recovery of public dues by a summary process of distress, issued by some public officer authorized by law, is an instance of redress of a particular kind of public wrong, by the act of the public through its authorized agents. There is, however, an important distinction between these. Though a private person may retake his property, or abate a nuisance, he is directly responsible for his acts to the proper judicial tribunals. His authority to do these acts depends not merely on the law, but upon the existence of such facts as are, in point of law, sufficient to constitute that authority; and he may be required, by an action at law, to prove those facts; but a public agent, who acts pursuant to the command of a legal precept, can justify his act by the production of such precept. He cannot be made responsible in a judicial tribunal for obeying the lawful command of the government; and the government itself, which gave the command, cannot be sued without its own consent.

At the same time there can be no doubt that the mere question, whether a collector of the customs is indebted to the United States, may be one of judicial cognizance. It is competent for the United States to sue any of its debtors in a court of law. It is equally clear that the United States may consent to be sued, and may yield this consent upon such terms and under such restrictions as it may think just. Though both the marshal and the government are exempt from suit, for any thing done by

the former in obedience to legal process, still, congress may provide by law, that both, or either, shall, in a particular class of cases, and under such restrictions as they may think proper to impose, come into a court of law or equity and abide by its determination. The United States may thus place the government upon the same ground which is occupied by private persons who proceed to take extra-judicial remedies for their wrongs, and they may do so to such extent, and with such restrictions, as may be thought fit.

When, therefore, the act of 1820 enacts, that after the levy of the distress warrant has been begun, the collector may bring before a district court the question, whether he is indebted as recited in the warrant, it simply waives a privilege which belongs to the government, and consents to make the legality of its future proceedings dependent on the judgment of the court; as we have already stated in case of a private person, every fact upon which the legality of the extra-judicial remedy depends may be drawn in question by a suit against him. The United States consents that this fact of indebtedness may be drawn in question by a suit against them. Though they might have withheld their consent, we think that, by granting it, nothing which may not be a subject of judicial cognizance is brought before the court.

To avoid misconstruction upon so grave a subject, we think it proper to state that we do not consider congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty; nor, on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination. At the same time there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper. Equitable claims to land by the inhabitants of ceded territories form a striking instance of such a class of cases; and as it depends upon the will of congress whether a remedy in the courts shall be allowed at all, in such cases, they may regulate it and prescribe such rules of determination as they may think just and needful. Thus it has been repeatedly decided in this class of cases, that upon their trial the acts of executive officers, done under the authority of congress, were conclusive, either upon particular facts involved in the inquiry or upon the whole title. Foley *v.* Harrison, 15 How. 433; Burgess *v.* Gray, 16 How. 48; —— *v.* The Minnesota Mining Company at the present term.

It is true, also, that even in a suit between private persons to

try a question of private right, the action of the executive power, upon a matter committed to its determination by the constitution and laws, is conclusive.   Luther *v.* Borden, 7 How. 1; Doe *v.* Braden, 16 How. 635.

To apply these principles to the case before us, we say that, though a suit may be brought against the marshal for seizing property under such a warrant of distress, and ·he may be put to show his justification; yet the action of the executive power in issuing the warrant, pursuant to the act of 1820, passed under the powers to collect and disburse the revenue granted by the constitution, is conclusive evidence of the facts recited in it, and of the authority to make the levy; that though no suit can be brought against the United States without the consent of congress, yet congress may consent to have a suit brought, to try the question whether the collector be indebted, that being a subject capable of judicial determination, and may empower a court to act on that determination, and restrain the levy of the warrant of distress within the limits of the debt judicially found to exist.

It was further urged that, by thus subjecting the proceeding to the determination of a court, it did conclusively appear that there was no such necessity for a summary remedy, by the action of the executive power, as was essential to enable congress to authorize this mode of proceeding.

But it seems to us that the just inference from the entire law is, that there was such a necessity for the warrant and the commencement of the levy, but not for its completion, if the collector should interpose, and file his bill and give security.   The provision that he may file his bill and give security, and thus arrest the summary proceedings, only proves that congress thought it not necessary to pursue them, after such security should be given, until a decision should be made by the court. It has no tendency to prove they were not, in the judgment of congress, of the highest necessity under all other circumstances; and of this necessity congress alone is the judge.

The remaining objection to this warrant is, that it was issued without the support of an oath or affirmation, and so was forbidden by the fourth article of the amendments of the constitution.   But this article has no reference to civil proceedings for the recovery of debts, of which a search warrant is not made part.   The process, in this case, is termed, in the act of congress, a warrant of distress.   The name bestowed upon it cannot affect its constitutional validity.   In substance, it is an extent authorizing a levy for the satisfaction of a debt; and as no other authority is conferred, to make searches or seizures, than is ordinarily embraced in every execution issued upon a

recognizance, or a stipulation in the admiralty, we are of opinion it was not invalid for this cause.

Some objection was made to the proceedings of the marshal under the warrant, because he did not levy on certain shares of corporate stock belonging to Swartwout, and because it does not appear, by the return of the warrant, that he had not goods and chattels wherewith to satisfy the exigency of the warrant. In respect to the corporate stocks, they do not appear to have been goods or chattels, subject to such levy at the time it was made; and the return of the marshal, that he had levied on the lands by virtue of the warrant, is, at least, *primâ facie* evidence that his levy was not irregular, by reason of the existence of goods and chattels of the collector subject to his process.

The third question is, therefore, to be answered in the affirmative.

This renders the other questions proposed immaterial, and no answer need be returned thereto.

The other two cases—John Den, *ex dem.* James B. Murray et al. *v.* The Hoboken Land and Improvement Company. And John Den, *ex dem.* William P. Rathbone et al. *v.* Rutsen Suckley et al., are disposed of by this opinion, the same questions having been certified therein.