Justice Breyer,
with whom Justice Ginsburg, Justice Sotomayor, and Justice Kagan join,
dissenting.
Pierce Marshall filed a claim in Federal Bankruptcy Court against the estate of Vickie Marshall. His claim asserted that Vickie Marshall had, through her lawyers, accused him of trying to prevent her from obtaining money that his father had wanted her to have; that her accusations violated state defamation law; and that she consequently owed Pierce Marshall damages. Vickie Marshall filed a compulsory counterclaim in which she asserted that Pierce Marshall had unlawfully interfered with her husband’s efforts to grant her an inter vivos gift and that he consequently owed her damages.
The Bankruptcy Court adjudicated the claim and the counterclaim. In doing so, the court followed statutory procedures applicable to “core” bankruptcy proceedings. See 28 U. S. C. § 157(b). And ultimately the Bankruptcy Court entered judgment in favor of Vickie Marshall. The question before us is whether the Bankruptcy Court possessed jurisdiction to adjudicate Vickie Marshall’s counterclaim. I agree with the Court that the bankruptcy statute, *506 § 157(b)(2)(C), authorizes a bankruptcy court to adjudicate the counterclaim. But I do not agree with the majority about the statute’s constitutionality. I believe the statute is consistent with the Constitution’s delegation of the “judicial Power of the United States” to the Judicial Branch of Government. Art. Ill, §1. Consequently, it is constitutional.
I
My disagreement with the majority's conclusion stems in part from my disagreement about the way in which it interprets, or at least emphasizes, certain precedents. In my view, the majority overstates the current relevance of statements this Court made in an 1856 ease, Murray’s Lessee v. Hoboken Land & Improvement Co., 18 How. 272, and it overstates the importance of an analysis that did not command a Court majority in Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U. S. 50 (1982), and that was subsequently disavowed. At the same time, I fear the Court understates the importance of a watershed opinion widely thought to demonstrate the constitutional basis for the current authority of administrative agencies to adjudicate private disputes, namely, Crowell v. Benson, 285 U. S. 22 (1932). And it fails to follow the analysis that this Court more recently has held applicable to the evaluation of claims of a kind before us here, namely, claims that a congressional delegation of adjudicatory authority violates separation-of-powers principles derived from Article III. See Thomas v. Union Carbide Agricultural Products Co., 473 U. S. 568 (1986); Commodity Futures Trading Comm’n v. Schor, 478 U. S. 833 (1986).
I shall describe these cases in some detail in order to explain why I believe we should put less weight than does the majority upon the statement in Murray’s Lessee and the analysis followed by the Northern Pipeline plurality and instead should apply the approach this Court has applied in Crowell, Thomas, and Schor.
*507 A
In Murray’s Lessee, the Court held that the Constitution permitted an executive official, through summary, nonjudicial proceedings, to attach the assets of a customs collector whose account was deficient. The Court found evidence in common law of “summary method[s] for the recovery of debts due to the crown, and especially those due from receivers of the revenues,” 18 How., at 277, and it analogized the Government’s summary attachment process to the kind of self-help remedies available to private parties, id., at 288. In the course of its opinion, the Court wrote:
“[W]e do not consider congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty; nor, on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination. At the same time there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible, of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.” Id., at 284.
The majority reads the first part of the statement’s first sentence as authoritatively defining the boundaries of Article III. Ante, at 484. I would read the statement in a less absolute way. For one thing, the statement is in effect dictum. For another, it is the remainder of the statement, announcing a distinction between “public rights” and “private rights,” that has had the more lasting impact. Later Courts have seized on that distinction when upholding non-Article III adjudication, not when striking it down. See Ex parte Bakelite Corp., 279 U. S. 438, 451-452 (1929) (Court of Customs Appeals); Williams v. United States, 289 U. S. 558, 579-580 (1933) (Court of Claims). The one exception is Northern *508 Pipeline, where the Court struck down the Bankruptcy Act of 1978. But in that case there was no majority. And a plurality, not a majority, read the statement roughly in the way the Court does today. See 458 U. S., at 67-70.
B
At the same time, I believe the majority places insufficient weight on Crowell, a seminal case that clarified the scope of the dictum in Murray’s Lessee. In that case, the Court considered whether Congress could grant to an Article I administrative agency the power to adjudicate an employee’s workers’ compensation claim against his employer. The Court assumed, that an Article III court would review the agency’s decision de novo in respect to questions of law but it would conduct a less searching review (looking to see only if the agency’s award was “supported by evidence in the record”) in respect to questions of fact. Crowell, 285 U. S., at 48-50. The Court pointed out that the case involved a dispute between private persons (a matter of “private rights”) and (with one exception not relevant here) it upheld Congress’ delegation of primary factfinding authority to the agency.
Justice Brandéis, dissenting (from a here-irrelevant portion of the Court’s holding), wrote that the adjudicatory scheme raised only a due process question: When does due process require decision by an Article III judge? He answered that question by finding constitutional the statute’s delegation of adjudicatory authority to an agency. Id., at 87.
Crowell has been hailed as “the greatest of the cases validating administrative adjudication.” Bator, The Constitution as Architecture: Legislative and Administrative Courts Under Article III, 65 Ind. L. J. 238, 251 (1990). Yet, in a footnote, the majority distinguishes Crowell as a case in which the Court upheld the delegation of adjudicatory authority to an administrative agency simply because the agency’s power to make the “specialized, narrowly confined *509 factual determinations” at issue arising in a “particularized area of law” made the agency a “true 'adjunct’ of the District Court.” Ante, at 489-490, n. 6. Were Crowell’s holding as narrow as the majority suggests, one could question the validity of Congress’ delegation of authority to adjudicate disputes among private parties to other agencies such as the National Labor Relations Board, the Commodity Futures Trading Commission, the Surface Transportation Board, and the Department of Housing and Urban Development, thereby resurrecting important legal questions previously thought to have been decided. See 29 U. S. C. § 160; 7 U. S. C. § 18; 49 U. S. C. § 10704; 42 U. S. C. § 3612(b).
C
The majority, in my view, overemphasizes the precedential effect of the plurality opinion in Northern Pipeline. Ante, at 486-487. There, the Court held unconstitutional the jurisdictional provisions of the Bankruptcy Act of 1978 granting adjudicatory authority to bankruptcy judges who lack the protections of tenure and compensation that Article III provides. Four Members of the Court wrote that Congress could grant, adjudicatory authority to a non-Article III judge only where (1) the judge sits on a “territorial cour[t],” (2) the judge conducts a “courts-martial,” or (3) the case involves a “public right,” namely, a “matter” that “at a minimum arise[s] 'between the government and others.’” 458 U. S., at 64-70 (plurality opinion) (quoting Ex parte Bakelite Corp., supra, at 451). Two other Members of the Court, without accepting these limitations, agreed with the result because the case involved a breaeh-of-contract claim brought by the bankruptcy trustee on behalf of the bankruptcy estate against a third party who was not part of the bankruptcy proceeding, and none of the Court’s preceding cases (which, the two Members wrote, “do not admit of easy synthesis”) had “gone so far as to sanction th[is] type of adjudication.” 458 U. S., at 90-91 (Rehnquist, J. concurring in judgment).
*510 Three years later, the Court held that Northern Pipeline
“establishes only that Congress may not vest in a non-Artiele III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review.” Thomas, 473 U. S., at 584.
D
Rather than leaning so heavily on the approach taken by the plurality in Northern Pipeline, I would look to this Court’s more recent Article III cases Thomas and Schor— cases that commanded a clear majority. In both cases the Court took a more pragmatic approach to the constitutional question. It sought to determine whether, in the particular instance, the challenged delegation of adjudicatory authority posed a genuine and serious threat that one branch of Government sought to aggrandize its own constitutionally delegated authority by encroaching upon a field of authority that the Constitution assigns exclusively to another branch.
1
In Thomas, the Court focused directly upon the nature of the Article III problem, illustrating how the Court should determine whether a delegation of adjudicatory authority to a non-Article III judge violates the Constitution. The statute in question required pesticide manufacturers to submit to binding arbitration claims for compensation owed for the use by one manufacturer of the data of another to support its federal pesticide registration. After describing Northern Pipeline’s, holding in the language I have set forth above, supra this page, the Court stated that “practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III.” Thomas, 478 U. S., at 587 (emphasis added). It indicated that Article Ill’s requirements could not be “determined” by “the identity of the parties alone,” ibid., or by the “private rights”/ “public *511 rights” distinction, id., at 585-586. And it upheld the arbitration provision of the statute.
The Court pointed out that the right in question was created by a federal statute, it “represent^] a pragmatic solution to the difficult problem of spreading [certain] costs,” and the statute “does not preclude review of the arbitration proceeding by an Article III coiirt.” Id., at 589-592. The Court concluded:
“Given the nature of the right at issue and the concerns motivating the Legislature, we do not think this system threatens the independent role of the Judiciary in our constitutional scheme.” Id., at 590.
2
Most recently, in Schor, the Court described in greater detail how this Court should analyze this kind of Article III question. The question at issue in Schor involved a delegation of authority to an agency to adjudicate a counterclaim. A customer brought before the Commodity Futures Trading Commission (CFTC) a claim for reparations against his commodity futures broker. The customer noted that his brokerage account showed that he owed the broker money, but he said that the broker’s unlawful actions had produced that debit balance, and he sought damages. The broker brought a counterclaim seeking the money that the account showed the customer owed. This Court had to decide whether agency adjudication of such a counterclaim is consistent with Article III.
In doing so, the Court expressly “declined to adopt formalistic and unbending rules.” Schor, 478 U. S., at 851. Rather, it “weighed a number of factors, none of which has been deemed determinative, with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary.” Ibid. Those relevant factors include (1) “the origins and importance of the right to be adjudicated”; (2) “the extent to which *512 the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts”; (3) the extent to which the delegation nonetheless reserves judicial power for exercise by Article III courts; (4) the presence or “absence of consent to an initial adjudication before a non-Article III tribunal”; and (5) “the concerns that drove Congress to depart from” adjudication in an Article III court. Id., at 849, 851.
The Court added that where “private rights,” rather than “public rights,” are involved, the “danger of encroaching on the judicial powers” is greater. Id., at 858-854 (internal quotation marks omitted). Thus, while non-Article III adjudication of “private rights” is not necessarily unconstitutional, the Court’s constitutional “examination” of such a scheme must be more “searching.” Ibid.
Applying this analysis, the Court upheld the agency’s authority to adjudicate the counterclaim. The Court conceded that the adjudication might be of a kind traditionally decided by a court and that the rights at issue were “private,” not “public.” Id., at 853. But, the Court said, the CFTC deals only with a “ ‘particularized area of law’ the decision to invoke the CFTC forum is “left entirely to the parties”; Article III courts can review the agency’s findings of fact under “the same ‘weight of the evidence’ standard sustained in Cro-well” and review its “legal determinations . .. de novo”; and the agency's “counterclaim jurisdiction” was necessary to make “workable” a “reparations procedure,” which constitutes an important part of a congressionally enacted “regulatory scheme.” Id., at 852-856. The Court concluded that for these and other reasons “the magnitude of any intrusion on the Judicial Branch can only be termed de minimis.” Id., at 856.
II
A
This case law, as applied in Thomas and Sckor, requires us to determine pragmatically whether a congressional dele *513 gation of adjudicatory authority to a non-Article III judge violates the separation-of-powers principles inherent in Article III. That is to say, we must determine through an examination of certain relevant factors whether that delegation constitutes a significant encroachment by the Legislative or Executive Branches of Government upon the realm of authority that Article III reserves for exercise by the Judicial Branch of Government. Those factors include (1) the nature of the claim to be adjudicated; (2) the nature of the non-Article III tribunal; (3) the extent to which Article III courts exercise control over the proceeding; (4) the presence or absence of the parties’ consent; and (5) the nature and importance of the legislative purpose served by the grant of adjudicatory authority to a tribunal with judges who lack Article Ill’s tenure and compensation protections. The presence of “private rights” does not automatically determine the outcome of the question but requires a more “searching” examination of the relevant factors. Schor, swpra, at 854.
Insofar as the majority would apply more formal standards, it simply disregards recent, controlling precedent. Thomas, 473 U. S., at 587 (“[Practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III”); Schor, supra, at 851 (“[T]he Court has declined to adopt formalistic and unbending rules” for deciding Article III cases).
B
Applying Schor’s approach here, I conclude that the delegation of adjudicatory authority before us is constitutional. A grant of authority to a bankruptcy court to adjudicate compulsory counterclaims does not violate any constitutional separation-of-powers principle related to Article III.
First, I concede that the nature of the claim to be adjudicated argues against my conclusion. Vickie Marshall’s counterclaim — a kind of tort suit — resembles “a suit at the common law.” Murray’s Lessee, 18 How., at 284. Although not *514 determinative of the question, see Schor, 478 U. S., at 853, a delegation of authority to a non-Article III judge to adjudicate a claim of that kind poses a heightened risk of encroachment on the Federal Judiciary, id., at 854.
At the same time the significance of this factor is mitigated here by the fact that bankruptcy courts often decide claims that similarly resemble various common-law actions. Suppose, for example, that ownership of 40 acres of land in the bankruptcy debtor’s possession is disputed by a creditor. If that creditor brings a claim in the bankruptcy court, resolution of that dispute requires the bankruptcy court to apply the same state property law that would govern in a state-court proceeding. This kind of dispute arises with regularity in bankruptcy proceedings.
Of course, in this instance the state-law question is embedded in a debtor’s counterclaim, not a creditor’s claim. But the counterclaim is “compulsory.” It “arises out of the transaction or occurrence that is the subject matter of the opposing party’s claim.” Fed. Rule Civ. Proc. 13(a); Fed. Rule Bkrtey. Proc. 7013. Thus, resolution of the counterclaim will often turn on facts identical to, or at least related to, those at issue in a creditor’s claim that is undisputedly proper for the bankruptcy court to decide.
Second, the nature of the non-Article III tribunal argues in favor of constitutionality. That is because the tribunal is made up of judges who enjoy considerable protection from improper political influence. Unlike the 1978 Act which provided for the appointment of bankruptcy judges by the President with the advice and consent of the Senate, 28 U. S. C. § 152 (1976 ed., Supp. IV), current law provides that the federal courts of appeals appoint federal bankruptcy judges, § 152(a)(1) (2006 ed.). Bankruptcy judges are removable by the circuit judicial council (made up of federal court of appeals and district court judges) and only for cause. § 152(e). Their salaries are pegged to those of federal district court judges, § 153(a), and the cost of their courthouses and other *515 work-related expenses are paid by the Judiciary, §156. Thus, although Congress technically exercised its Article I power when it created bankruptcy courts, functionally, bankruptcy judges can be compared to magistrate judges, law clerks, and the Judiciary’s administrative officials, whose lack of Article III tenure and compensation protections do not endanger the independence of the Judicial Branch.
Third, the control exercised by Article III judges over bankruptcy proceedings argues in favor of constitutionality. Article III judges control and supervise the bankruptcy court’s determinations — at least to the same degree that Article III. judges supervised the agency’s determinations in Crowell, if not more so. Any party may appeal those determinations to the federal district court, where the federal judge will review all determinations of fact for clear error and will review all determinations of law de novo. Fed. Rule Bkrtcy. Proc. 8013; 10 Collier on Bankruptcy ¶ 8013.04 (16th ed. 2011). But for the here-irrelevant matter of what Crowell considered to be special “constitutional” facts, the standard of review for factual findings here (“clearly erroneous”) is more stringent than the standard at issue in Crowell (whether the agency’s factfinding was “supported by evidence in the record”). 285 U. S., at 48; see Dickinson v. Zurko, 527 U. S. 150, 152, 153 (1999) (“unsupported by substantial evidence” more deferential than “clearly erroneous” (internal quotation marks omitted)). And, as Crowell noted, “there is no requirement that, in order to maintain the essential attributes of the judicial power, all determinations of fact in constitutional courts shall be made by judges.” 285 U. S., at 51.
Moreover, in one important respect Article III judges maintain greater control over the bankruptcy court proceedings at issue here than they did over the relevant proceedings in any of the previous cases in which this Court has upheld a delegation of adjudicatory power. The District Court here may “withdraw, in whole or in part, any case or *516 proceeding referred [to the Bankruptcy Court]... on its own motion or on timely motion of any party, for cause shown.” 28 U. S. C. § 157(d); cf. Northern Pipeline, 458 U. S., at 80, n. 31 (plurality opinion) (contrasting pre-1978 law where “power to -withdraw the case from the [bankruptcy] referee” gave district courts “control” over case with the -unconstitutional 1978 statute, which provided no such district court authority).
Fourth, the fact that the parties have consented to Bankruptcy Court jurisdiction argues in favor of constitutionality, and strongly so. Pierce Marshall, the counterclaim defendant, is not a stranger to the litigation, forced to appear in Bankruptcy Court against his will. Cf. id., at 91 (Rehnquist, J., concurring in judgment) (suit was litigated in Bankruptcy Court “over [the defendant’s] objection”). Rather, he appeared voluntarily in Bankruptcy Court as one of Vickie Marshall’s creditors, seeking a favorable resolution of his claim against Vickie Marshall to the detriment of her other creditors. He need not have filed a claim, perhaps not even at the cost of bringing it in the future, for he says his claim is “nondischargeable,” in which case he could have litigated it in a state or federal court after distribution. See 11 U. S. C. § 523(a)(6). Thus, Pierce Marshall likely had “an alternative forum to the bankruptcy court in which to pursue [his] clai[m].” Granfinanciera, S. A. v. Nordberg, 492 U. S. 33, 59, n. 14 (1989).
The Court has held, in a highly analogous context, that this type of consent argues strongly in favor of using ordinary bankruptcy court proceedings. In Granfinanciera, the Court held that when a bankruptcy trustee seeks to void a transfer of assets from the debtor to an individual on the ground that the transfer to that individual constitutes an unlawful “preference,” the question whether the individual has a right to a jury trial “depends upon whether the creditor has submitted a claim against the estate.” Id., at 58. The folio-wing year, in Langenkamp v. Culp, 498 *517 U. S. 42 (1990) (per curiam), the Court emphasized that when the individual files a claim against the estate, that individual has
“triggered] the process of 'allowance and disallowance of claims/ thereby subjecting himself to the bankruptcy court’s equitable power. If the creditor is met, in turn, with a preference action from the trustee, that action becomes part of the claims-allowance process which is triable only in equity. In other words, the creditor’s claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court’s equity jurisdiction.” Id., at 44 (quoting Granfinanciera, 492 U. S., at 58; citations omitted).
As we have recognized, the jury trial question and the Article III question are highly analogous. See id., at 52-53. And to that extent, Granfinanciera’s and Langenkamp’s basic reasoning and conclusion apply here: Even when private rights are at issue, non-Article III adjudication may be appropriate when both parties consent. Cf. Northern Pipeline, supra, at 80, n. 31 (plurality opinion) (noting the importance of consent to bankruptcy jurisdiction). See also Schor, 478 U. S., at 849 (“[Ajbsence of consent to an initial adjudication before a non-Article III tribunal was relied on [in Northern Pipeline] as a significant factor in determining that Article III forbade such adjudication”). The majority argues that Pierce Marshall “did not truly consent” to bankruptcy jurisdiction, ante, at 493, but filing a proof of claim was sufficient in Langenkamp and Granfinanciera, and there is no relevant distinction between the claims filed in those cases and the claim filed here.
Fifth, the nature and importance of the legislative purpose served by the grant of adjudicatory authority to bankruptcy tribunals argues strongly in favor of constitutionality. Congress’ delegation of adjudicatory powers over counter *518 claims asserted against bankruptcy claimants constitutes an important means of securing a constitutionally authorized end. Article I, § 8, of the Constitution explicitly grants Congress the “Power To . . . establish . . . uniform Laws on the subject of Bankruptcies throughout the United States.” James Madison wrote in the Federalist Papers that the
“power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question.” The Federalist No. 42, p. 271 (C. Rossiter ed. 1961).
Congress established the first Bankruptcy Act in 1800. 2 Stat. 19. From the beginning, the “core” of federal bankruptcy proceedings has been “the restructuring of debtor-creditor relations.” Northern Pipeline, supra, at 71 (plurality opinion). And, to be effective, a single tribunal must have broad authority to restructure those relations, “having jurisdiction of the parties to controversies brought before them,” “deciding] all matters in dispute,” and “decree[ing] complete relief.” Katchen v. Landy, 382 U. S. 323, 335 (1966) (internal quotation marks omitted).
The restructuring process requires a creditor to file a proof of claim in the bankruptcy court. 11 U. S. C. § 501; Fed. Rule Bkrtcy. Proc. 3002(a). In doing so, the creditor “triggers the process of 'allowance and disallowance of claims,’ thereby subjecting himself to the bankruptcy court’s equitable power.” Langenkamp, supra, at 44 (quoting Granfinanciera, supra, at 58). By filing a proof of claim, the creditor agrees to the bankruptcy court’s resolution of that claim, and if the creditor wins, the creditor will receive a share of the distribution of the bankruptcy estate. When the bankruptcy estate has a related claim against that creditor, that counterclaim may offset the creditor’s claim, or even *519 yield additional damages that augment the estate and may be distributed to the other creditors.
The consequent importance to the total bankruptcy scheme of permitting the trustee in bankruptcy to assert counterclaims against claimants, and resolving those counterclaims in a bankruptcy court, is reflected in the fact that Congress included “counterclaims by the estate against persons filing claims against the estate” on its list of “[c]ore proceedings.” 28 U. S. C. § 157(b)(2)(C). And it explains the difference, reflected in this Court’s opinions, between a claimant’s and a nonclaimant’s constitutional right to a jury trial. Compare Granftnanciera, 492 U. S., at 58-59 (“Because petitioners ... have not filed claims against the estate” they retain “their Seventh Amendment right to a trial by jury”), with Langenkamp, 498 U. S., at 45 (“Respondents filed claims against the bankruptcy estate” and “[c]onse-quently, they were not entitled to a jury trial”).
Consequently a bankruptcy court’s determination of such matters has more than “some bearing on a bankruptcy case.” Ante, at 499 (emphasis deleted). It plays a critical role in Congress’ constitutionally based effort to create an efficient, effective federal bankruptcy system. At the least, that is what Congress' concluded. We owe deference to that determination, which shows the absence of any legislative or executive motive, intent, purpose, or desire to encroach upon areas that Article III reserves to judges to whom it grants tenure and compensation protections.
Considering these factors together, I conclude that, as in Schor, “the magnitude of any intrusion on the Judicial Branch can only be termed de minimis.” 478 U. S., at 856. I would similarly find the statute before us constitutional.
III
The majority predicts that as a “practical matter ’ today s decision “does not change all that much.” Ante, at 501-502. But I doubt that is so. Consider a typical case: A tenant *520 files for bankruptcy. The landlord files a claim for unpaid rent. The tenant asserts a counterclaim for damages suffered by the landlord’s (1) failing to fulfill his obligations as lessor, and (2) improperly recovering possession of the premises by misrepresenting the facts in housing court. (These are close to the facts presented in In re Beugen, 81 B. R. 994 (Bkrtcy. Ct. ND Cal. 1988).) This state-law counterclaim does not “ste[m] from the bankruptcy itself,” ante, at 499, it would not “necessarily be resolved in the claims allowance process,” ibid., and it would require the debtor to prove damages suffered by the lessor’s failures, the extent to which the landlord’s representations to the housing court were untrue, and damages suffered by improper recovery of possession of the premises, cf. ante, at 497-498. Thus, under the majority’s holding, the federal district judge, not the bankruptcy judge, would have to hear and resolve the counterclaim.
Why is that a problem? Because these types of disputes arise in bankruptcy court with some frequency. See, e. g., In re CBI Holding Co., 529 F. 3d 432 (CA2 2008) (state-law claims and counterclaims); In re Winstar Communications, Inc., 348 B. R. 234 (Bkrtcy. Ct. Del. 2005) (same); In re Ascher, 128 B. R. 639 (Bkrtcy. Ct. ND Ill. 1991) (same); In re Sun West Distributors, Inc., 69 B. R. 861 (Bkrtcy. Ct. SD Cal. 1987) (same). Because the volume of bankruptcy cases is staggering, involving almost 1.6 million filings last year, compared to a federal district court docket of around 280,000 civil cases and 78,000 criminal cases. Administrative Office of the United States Courts, J. Duff, Judicial Business of the United States Courts: Annual Report of the Director 14 (2010). Because unlike the “related” noncore state-law claims that bankruptcy courts must abstain from hearing, see ante, at 502, compulsory counterclaims involve the same factual disputes as the claims that may be finally adjudicated by the bankruptcy courts. Because under these circumstances, á constitutionally required game of jurisdictional *521 ping-pong between courts would lead to inefficiency, increased cost, delay, and needless additional suffering among those faced with bankruptcy.
For these reasons, with respect, I dissent.