The opinion of the Court was delivered by
Wardlaw, A. J.
The appeals in these cases, in which convictions for misdemeanors have been had in District *121 Courts, some against white persons and some against persons of color, present constitutional questions concerning the trial in a District Court, which have been all discussed together, and will now be considered.
First, is a preliminary question. Are the State Constitution of September, 1865, and the Legislative Acts had thereunder, constitutional and valid ?
Second. Is the Act, whereby a grand jury is dispensed with, constitutional?
Third. Is the trial by a petit jury of eight constitutional?
Fourth. Is the extension to white persons of trial for misdemeanors in the District Court, constitutional ?
First. It has been argued that the government of the State is now only provisional — that there has been no legal government since the termination of the civil war, perhaps none since its commencement; that the call of the convention of September, 1865, was not made in conformity with the State Constitution, nor by any competent authority; and that every thing which was done by the convention, or by a Legislature elected and assembled under its supposed ordinances, is utterly void. We will not enter into the great political questions involved in this argument. Under the Constitution framed by the convention of September, 1865, a government in fact has subsisted ever since, and without it there would be anarchy; to this government the people of the State yield their obedience, affording thus spontaneous and continuous satisfaction of what the convention did, and of it this Court itself is but a part. No members of the Legislature now exist in the State, although the times provided by the Constitution for the election and meeting of such members have passed, and resort to the original source of power is necessary for the establishment of a Legislature; but officers of the State,, executive and judicial, continue to hold and exercise their offices, at least by sufferance of, and in subordination to the' *122 military authority of the United States ; and tbelawsof the State, where they are not altered or controlled by the orders of the Commanding General, are left for the regulation of society. The Constitution of September, 1865, under which these laws have been in part enacted, and are administered, must then be recognized as the fundamental law of the State, in disregard of all objections which may be made to the convention which framed it.
Second. No grand jury. By the second section of an Act of December, 1866, (13 Stat. 493,) amendatory of previous Acts concerning District Courts, it is enacted “that no presentment of a grand jury shall be necessary in any case in the said District Court, but it shall be the duty of the Attorney-General and solicitors, after enquiring into the facts of each case, to prepare bills of indictment and present the same, with the papers pertaining thereto, to the District Judge for his examination, who shall order the same to be docketed for trial, if in his judgment the prosecution thereof be advisable.” .A previous Act of September, 1866, (13 Stat. 388,) had by its sixth section given to the District Judge power to “examine and supervise all prosecutions, commitments, and warrants of arrest commenced before or issued by any magistrate within his district, for any misdemeanors,” and in the exercise of a sound discretion, to direct the discontinuance thereof; and by section twenty-one had provided that “if the accused be acquitted, the Judge before whom the trial shall be had, if he has become satisfied during the trial that the prosecution was without probable cause, may order that the prosecutor shall pay the costs of the' prosecution, for which the clerk shall issue execution.”
It is manifest that the written accusation, which the second section of the Act of December, 1866, requires the Attorney-General, or Solicitor, to present, and the District Judge in the exercise of his judgment to order to be *123 docketed, although called a bill of indictment, is an information. An indictment is an accusation or declaration at the suit of the king, for some offence found by a proper jury of twelve men. An information (as a mode of prosecution) is a declaration of the charge or offence against any one at the suit of the king, filed by a public officer, without the intervention of a grand jury. (Com. Digest: Indictment, A; Information, A.) This latter mode of prosecution is confined to misdemeanors, and so confined is as ancient as the common law itself. (4 Bla. Com. 309; 1 Shower’s Rep. 118.) Can it be constitutionally used in South Carolina ?
In a case, The State vs. Mitchell, (1 Bay, 262,) 1792, it is reported that the Court concurred in an opinion, which counsel on both sides had attained, that by the State Constitution of 1790, (Art. 3, § 2,) the mode of prosecution by information was virtually abolished. The section here referred to is in these words: “ The style of all process shall be, The State of South Carolina; all prosecutions shall be carried on in the name and by the authority of the State of South Carolina, and conclude, against the peace and dignity of the same.” In September, 1776, at the first meeting of the General Assembly which took place after the Declaration of Independence, the word State instead of Colony was introduced into Legislative Acts. (2 Stat. 852.) The first article of the Constitution which was adopted by the Legislature in March, 1778, is, “that the style of this country be hereafter the State of South Carolina.” (1 Stat. 138.) The obvious purpose of the section above quoted from the Constitution of 1790, was to extend the article which we have cited from the Constitution of 1778, and in express words to confirm and perpetuate the changes which had taken place. It in effect ordained that instead of king shall be used State, — not commonwealth, people, or republic; to the State shall be transferred the forms and authority which, *124 during colonial times, appertained to the king, and it provided in article 6, § 6; “all commissions shall be in the name and by the authority of the State.” All process remained substantially the same, notwithstanding the change of stylo, and all modes of prosecution would to a common understanding seem to be affected only in form, and to remain in substance as they had been before, according to article 7, which declares that “ all laws of force in this State at the passing of this Constitution, shall continue until altered or repealed by the Legislature.” Prosecutions were to be carried on in the name of the State, and infor-mations, it was held, could not be embraced, because they had been carried on, not in the name of the king, but in the name of the Attorney-General, or some other public officer. This holding was founded on mistake. In Bacon’s Abridgment (Information,) and other works of less authority, may be found occasional mention of informations in the name of the Attorney General, and informations in the name of the Master of the Crown office, but careful examination will show that by this is meant only information filed by one or the other of these officers, in which his name is set forth as the informer, but that in England, in every such case, the information of an offence is exhibited, and the prosecution under it carried on in the name of the king. Blackstone says, (4 Black. Com. 308,) “ informations are of two sorts; first, those which are partly at the suit of the king, and partly at that of a subject; and secondly, such as are only in the name of the king.” And the second sort he divides again into informations filed ex-officio by the Attorney General, and “ the other species,” which are filed by the master of the crown office upon the complaint or relation of any private subject. This other species (of which are those authorized by the Act of December, 1866,) was abused, and “ being filed in the name of the king, they subjected the prosecutor to no costs, though on trial they *125 proved groundless;” therefore, the Statute of 4 & 5 W. & M. Ch. 18, forbade the clerk of the crown to file any information without direction of the Court of King’s "Bench, and required the prosecutor to give recognizance, and to pay costs in case of the defendant’s acquittal, unless the Judge certified that there was reasonable cause for the accusation, provisions to which it will be seen, the regulations concerning the District Courts have been in effect conformed. There is little more propriety in saying that an information is a suit in the name of the officer who files it, than there would be in saying that an indictment is a suit in the name of the solicitor who signs it, or any civil action a suit in the name of the plaintiff’s attorney, whose name is inserted in the declaration.
The case of Ward vs. Tyler, (1 N. & McC. 23,) whilst it adverts to the “ words in the Constitution which are relied on as operating a virtual repeal of the proceeding by information” holds that, "they are to be construed as relating to prosecutions for acts purely criminal,” and that the Act of 1803, (5 Stat. 466,) which provided information as the mode for an informer’s recovering to his own use a fine enacted for neglect of the law concerning estrays, excluded other modes of recovery, and that in that case information was admissible as a sort of qui tam action carried on by a criminal instead of a civil process. The case of the State vs. Mathews, 1806, (2 Brev. 82,) in reference to an Act of 1784, (4 Stat. 608, § 3,) which authorized an informer to recover, by bill, plaint or information, from the transgressor, a penalty for his keeping a billiard table without a license, and the case of the State vs. Helfrid, 1820, (2 N. & McC. 234,) in reference to a similar provision of an Act of 1741, (3 Stat. 583, § 7,) concerning tavern licenses, whilst they disagree as to the propriety of including indictment under HU, both likewise express the opinion that information for penalties in the nature of qui tam actions, Blackstone’s first *126 sort, do not come within tbe prohibition acknowledged in tbe case of The State vs. Mitchell. If the Constitution of 1790 requires all prosecutions to be by indictment, it is not easy to perceive tbe grounds upon which these prosecutions of offenders against statute law, punishable by fines, have been excepted. It is however apparent, as we believe, that tbe section cited of the Constitution of 1790 contains no implied prohibition of information as a mode of prosecution, that this mode is conformable to the common law, and was recognized by Acts of the Legislature, -before and after that Constitution, as existing. . To some other constitutional provision resort must be had to find such restraint upon legislative power as prevents the establishment and regulation of this mode.
Magna Charta is invoked. The 29th chapter of the Great Charter, 9 Hen. III. was made of force here in 1712, (2 Stat. 417,) a translation of it was inserted in the Constitution of 1778, art. 41, (1 Stat. 146;) and with slight alteration copied in the Constitutions of 1790 and 1861 (Art. 9, § 2.) (No freeman shall be taken, &c., but by the judgment of his peers or by the law of the land.) Taking for granted that the judgment of his peers means the verdict of a jury, our judges have had difficulty in settling the meaning of lato of the land. (Zylstra vs. Corp. Charleston, 1 Bay, 391; Lindsay vs. Commis’rs, 2 Bay, 59; White vs. Kendrick, 1 Brev. 471; Adm’rs. Byrne vs. Stewart, 3 Des. Eq. 478; State vs. Simons, 2 Sp. 766; Com’r. vs. Newtown Cut, 2 Strob. 564; City Council vs. Stelges, 10 Rich. 440.) At first it was held to mean the old common law, such as subsisted when Magna Charta was granted. Afterwards it was held that by the Constitution of 1790 a new epoch was established, and that referring to that, law of the land means law existing when that Constitution was adopted. But sometimes opinions were expressed that it meant general law regularly enacted by the legislative powers, distinguished from *127 special and partial acts — a rule .as opposed to a sentence or arbitrary discretion, (a) Many cases may be found in our reports, some not unambiguous, which have discussed the meaning of law of the land, a few intimating acquiescence in the last of the meanings just mentioned, but most of them approving of the second, (b) which may be considered to be the meaning adopted by our Courts. If trial by jury is part of the law of the land, then in “ no freeman shall be taken except by verdict of a jury or the law of the landf there is a general prohibition with two exceptions, of which one contains the other; unless we consider that law of the land, in the disjunctive, means only the remainder of that law after so much as requires trial by jury has been taken off, in effect such portion of it as authorizes a freeman to be taken; &c., without the judgment of his peers. The Constitutions of 1790 and 1861 (art. 9, § 6)havehowever anothersection which specially guards against violations of the right of jury trials. “ The trial by jury as heretofore used in this State, * * shall be forever inviolably preserved,” an express negation of the power to impair in the form of an affirmative command to preserve. Distinct reference to a time, the adoption of the Constitution, is here made by heretofore, and the same time 1790, is in effect referred to by the subsequent Constitutions, for under all the same command has 'been continued. If a like reference is to be attributed to section two, the sixth section was tautological and superfluous under a construction which finds in the second a prohibition of all interference with person or property without *128 jury trial or the law as it stood when the Constitution was adopted. If; however, “law of the land” in the second meant any general rule duly established, or to be established, by the legislative authority, the denial in the sixth to the legislative and all other authorities, of the power to interfere with jury trials, was not inconsistent, but additional, — a confirmation of the general prohibition by a removing of one of the alternative exceptions. The two sections taken together maybe paraphrased thus : — no freeman shall be taken * * but by the judgment of his peers or the law of the land, and no law of the land shall impair the use which has heretofore been made of jury trials in this State; which is the same as this, no freeman shall be taken * * but by the verdict of a jury, or some other proceeding now authorized by the law of the land.
The Constitution of I860 (Art 9, § 7,) has the special provision which guards the right to jury trial, and in the extract from Magna Charta, which it also contains, instead of judgment of his peers or the law of the land, introduces the words, “due process of law.” The same words, and probably for the same reasons of congruity, had been introduced into the 5th Article of the Amendments of the Constitution of the United States. That amendment positively requires a grand jury in case of an accusation “ for a capital or otherwise infamous crime,” and forbids any person’s being “ deprived of life, liberty or property without due process of law.” (Banon vs. Baltimore, 7 Pet. 247; Lessee of Livingstone vs. Moore, 7 Pet. 552; Fox vs. Ohio, 5 How. 434.) To this amendment some of the defendants now before us have appealed ; but it has been settled by repeated decisions of the Supreme Court of the United States that this and other amendments adopted when it was, impose limitations on the exercise of power by the Government of the United States, but are not applicable to the legislation of the States. Without inquiring what crime and inf a- *129 mous mean, we merely suggest in this connection, that, according to Chancellor Kent, (1 Kent’s Com. 600, Sec. 24, p. 13,*) “ the better and larger definition of due process of law is, that it means law in its regular course of administration through courts of justice,” (Murray’s Lessee vs. Hoboken, 18 How. 280,) and that in 1855 the Supreme Court, by Mr. Justice Curtis, sustained a very summary proceeding, by which an owner was deprived of his land, and considered that due process of law ordinarily meant a settled course of judicial proceeding, but also embraced any process, not in conflict with any provision of the Constitution, wbicb is conformable to “ the settled usages and modes of proceedings, which existed in the common and statute law of England before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of the country.”
Resting mainly upon due process of law in our Constitution of 1865, some of these defendants have cited the words of Sir Edward Coke, (2 Inst. p. 50,) “ without due process of law, that is, by indictment or presentment of good and lawful men, when such deeds be done in due manner, or by writ original of the common law.” A rigid adherence to these words would exclude from the definition of due process of law not only criminal informations, but all equity proceedings, all proceedings had in Courts martial or ecclesiastical, municipal Courts, or tribunals for the 'summary decision of small causes, and even all proceedings in modern actions which dispense with the original writ. If, however, we must find a recondite meaning for words so plain as due process of law, and confine our search to the learned but unmethodical works of Sir Edward Coke, a perusal of his whole comments upon chapter twenty-nine and connected chapters of Magna Charta, contained in his second Institutes, will lead to the conclusion that he is *130 misunderstood by those wbo suppose that by due process of law be meant only the presentment of a grand jury or a writ original. In his exposition of nisi per legem terree, be cites three statutes of Edward III., in one of which he found the words rendered, without due process of law, and probably he found there too the presentment and writ which he gives as instances of due process; but he could have intended them only as instances, not at all exclusive of others, for immediately afterwards he quotes: “without presentment before justices, or thing of record,” (which would include an information,) “or by due process, or by writ original, according to the old law of the land.” At page 51 he distinguishes legem terree from legem regis and from legem populi, and considers it equivalent to legem angliee, “because it extends to all.” At page 46, he says: “ or by the law of the land ; that is, to speak it once for all, by the due course and process of law.” At page 51 he says: “Process of law is twofold, viz., by the king’s writ, or by due proceeding and warrant, either in deed, or in law without writ and he proceeds to show many cases in which a freeman may be arrested by warrant in law, even without any writing; in each of which cases, he says, a commitment “is accounted in law due process or proceeding, as well as by process by force of the king’s writ.” At page 47, he shows that a man may be exiled or banished, not by the king, “ but by authority of Parliament, or in case of abjuration for felony by the common law.” At page 48-9, treating of nolle men, -pares, he shows that judicium parium suorum extendeth to the king’s suit in case of treason or felony * * but not to any other inferior offence,” and ex-tendeth “to the trial itself whereby he is to be convicted, not to the inquest whereby he is indicted.” And, at page 56, he regards rectum as synonymous with process of law, the means whereby justice is attained. It would be hard to reconcile all of these passages with an opinion that law *131 of the land means common law and nothing else. Mach harder to reconcile them with the opinion that due process of law embraces only the presentment of a grand jury and a writ original of the common law. The distinction between the higher offences and misdemeanors, implied by one of these passages, is more fully shown by Sir Matthew Hale, (2 Hale’s P. O. 207,) who, although prejudiced against informations because of the abuses which had prevailed, admits that ‘'for crimes inferior to capital ones the proceedings may be by information, and this.from long and frequent practice is certainly established as part of the law of the land.” And Sir Bartholomew Shower, (1 Show. Rep. 123,) in an argument which has been deemed profound, showed that the great oppressions, which under a statute of Henry YII. had been connected with informa-tions, proceeded from trials had not by a jury, but at the arbitrary discretion of justices who heard and determined. No matter then which of the plausible meanings that have been ascribed to duo process of law, we adopt — whether a proceeding according to the old common law, a proceeding recognized by our law in 1790, or a proceeding enacted by general law in the regular course of legislation — information is found to be embraced; and nothing in Magna Charta forbade the Legislature from adopting that mode of prosecution for misdemeanory. •
It has however been urged that dispensing with a grand jury in cases of misdemeanor is an invasion of “the trial by jury as heretofore used in this State,” which, by a section introduced into the Constitution of 1790, and each subsequent State Constitution, as before cited, has been specially guarded. A trial is the examination of the matter of fact in issue, and the mode of trial, by jury, is distinguished from other modes, as by battle, by ordeal, by witnesses adduced before a judge, &c. The inquisition made by a grand jury precedes the issue, and is no part of the *132 trial. It bas been assumed that, although it may not be part of the trial, it is still a necessary preliminary to it, in all criminal cases, as heretofore it has been used in this State. The frequent mention of information as a mode of accusation in our Acts before and after 1776, and once at least after 1790, as shown by Acts before cited, contradicts this assumption. Yery often, in reference to proceedings affecting person or property, without jury trial, the question has been before our courts, whether the proceedings under examination violated the Constitution.(c) Of the opinions which were pronounced, it may be remarked: First. That although inquiries into the meaning of law of the land were entered into, they were not absolutely necessary ; for the special section in the Constitution concerning jury trial, if it had stood alone, would in every case have been just as effective as that section and the other, which contains the extract from Magna Charta, were when combined. Second. That whenever a proceeding was found to have been sanctioned by law that existed at the adoption of the Constitution of 1790, it was allowed to prevail, however invasive of jury trial it may have been. Third. That proceedings without jury' existing before 1790, served to authorize analagous proceedings subsequently directed by the Legislature; for instance, ¿justice of the peace had a certain summary jurisdiction, .therefore the same could be given' to the Recorder of Charleston. (City Council vs. Stelges, 10 Rich. 440.) The City Council of Charleston had certain powers, therefore the same could be extended to other Councils in towns and villages. (Crosby vs. Warren, *133 1 Rich. 385; Corporation of Columbia vs. Hunt, 5 Rich. 550.) Fourth. That the question in every case, except two, has been treated with the implied understanding that “as heretofore used” refers to the cases, subjects, occasions, to which in its previous use jury trial extended, and not to the forms respecting a jury before the trial; for the constitutional guard would be mocked by observance of forms and preliminaries with superstitious exactness, whilst cases were withdrawn from the favored tribunal, which had before been used for their trial. Fifth. That by the two excepted cases, Cregier vs. Bunton, (2 Strob. 490,) and State vs. Boatwright, (10 Rich. 409,) the discretionary power of the Legislature is recognized, as it had been exercised, concerning the qualifications of jurors,(d) peremptory challenges in civil cases and in misdemeanors,(e) special juries,(f) the mode of drawing jurors,(g) their pay,(h) and all particulars concerning the organization of juries.(i).
*134 The matters respecting juries, which are subject to the control of the Legislature, are the accidents on non-essentials of jury trial. We venture not to declare what are the essentials, without which there cannot be a jury or jury trial. It is safe to say that the jurors, free and lawful men sworn to find a true verdict, should form a substantial representation of the country, taken from the population of the territory, over which extends the jurisdiction of the court, in which they are to serve, (§ 2, Stat. 461;) that they should be the equals of the accused, or of the parties litigant, not professionally set apart for the duty they are called to perform, but summoned for the occasion when their services are required, subject to challenges for causes which produce suspicion of bias, (3 Stat. 279, § 18; 2 Stat. 649; 3 Stat. 729, § 3,) and permitted to deliberate in private upon the matters submitted to them. Peremptory challenges in capital cases, (2 & McC. 25; § 3, 2 Stat. 459,) unanimity (2 Stat. 541) and other incidents of jury trial not now before us, we do not consider. As to number, twelve has so long prevailed that whether or not it was suggested by the number of the Apostles, of the tribes of Judea, of the signs of the Zodiac, or of the months in a year, it is so associated with the common idea of a jury, and with the common language familiarly used concerning a jury, that a change of it by mere legislative authority might be expected to excite apprehension. Theory requires that the number of jurors should be such as to effect an infusion of popular sentiment and to secure community of interest and sympathy of feeling between the triers and the accused or parties litigant. (Note — Co. Litt. 155 a.) Twelve was supposed to answer these purposes, and although that number has been in special cases varied in England, it is probable that it would have been left to prevail in the'District Courts as in the superior Courts, if the convention of 1865, moved, it is supposed, by con-' *135 siderations of economy, had not suggested a change. This brings ns to the third question in these cases.
Third. A jury of eight. In Section 7, Article 9, of the Constitution of 1865, to the provision for preservation of jury trial are added these words: “ But the General Assembly shall have power to determine the number of persons who shall constitute the jury in the inferior and Disir'ict Courts.” By the same paramount authority, which might have abolished jury trial in these Courts, discretionary power as to the number of jurors is thus given to the Legislature ; and the Legislature, by Act of December, 1866, directed " that the juries in the District Court shall consist of one jury of eight jurors at each quarterly session, and the venire therefor shall consist of a panel of sixteen.” (13 Stat. 493, § 3.) Attention appears to have been called to the enormous expense which would proceed from the pay of jurors, if each of the thirty-one District Courts should at each of its quarterly sessions be attended by grand and petit jurors, in like manner as a superior Court is at its semi-annual terms; and the Legislature adopted this regulation, as well as the other before cited, which dispensed with grand jurors. The expediency of the measure was for the consideration of the Legislature; the competency of the Legislature, under the Constitution of 1865, to adopt this one is beyond doubt.
Fourth. The trial in the District Courts of white persons for misdemeanors. The Constitution of 1865, (Art. 3,) as the Constitutions of 1790 and 1861 had done, gave to the General Assembly full power to direct and establish superior and inferior Courts. Under this power, District Courts might have been established, and jurisdiction over persons and matters at the discretion of the Legislature have been intrusted to them. But the Constitution of 1865, not leaving the matter wholly to the discretion of the Legislature, goes on to require that, for each district, one or more Dis *136 trict Courts shall be established, eaob of which Courts “ shall have jurisdiction of all civil causes wherein, one or both of the parties are persons of color, and of all criminal cases wherein the accused is a person of color; and the General Assembly is empowered to extend the jurisdiction of the said Court to other subjects.” Subjects here undoubtedly means subjects of jurisdiction, and other shows that “causes and cases,” which alone had been previously mentioned, were called subjects. As in reference to persons of color, all cases, civil and criminal, had been specified, no other subjects of jurisdiction now suggest themselves, which would not affect white persons; and in the specifications, white persons litigating with or indicted with persons of color are included. What, then, hindered the Legislature, in its extension of the jurisdiction to other subjects, from embracing cases where white persons only were concerned ? The special empowering of the General Assembly to extend the jurisdiction to other subjects was only a declaration that the District Court was not to be confined to the subjects specified, proper to remove doubts, but neither enlarging nor restricting the discretionary power of the Legislature, under the general grant which enables it to direct and establish Courts.
. In December, 1865, an Act (13 Stat. 280, 37,) to establish District Courts gave to the District Court exclusive jurisdiction of cases, civil and criminal, where a person of color was a party, and also of cases of misdemeanor (whether the accused was white or not) affecting the person or property of a person of color, and of all cases of bastardy and all cases of vagrancy not tried before a magistrate. In September, 1866, the Civil Bights Act (13 Stat. 373) gave to persons of color “ full and equal benefit of the rights of personal security, personal liberty, and private property, and of all remedies and proceedings for the enforcement and protection of the same, as white persons now have.” *137 And at the same time the former District Court Act was almost entirely repealed, and a new one enacted, (18 Stat. 388, § 4,) by which exclusive jurisdiction is given to the District Court “in all cases of larceny and misdemeanor, in all cases of vagrancy, and in all cases of bastardy, arising within the limits of the election district in which it is established.” In December, 1866, it was enacted (13 Stat. 494, § 11) that the “Superior Courts of law and the District Court shall have concurrent jurisdiction of all cases in law, civil and criminal, of which, by the Constitution, the said District Courts have jurisdiction.” The Constitution, as we have seen, specified as subjects of District Court jurisdiction only cases wherein a person of color is a party. Under this legislation many disputed points have been presented, 'and have been decided in this Court or the Court of Appeals. See the State vs. Walker, Id. vs. Garner, Id. vs. Ellison, Id. vs. Sullivan, (14 Rich. 36, 143, 200, 281,) Id. vs. B. S. Moore, (MSS. Dec. 1867.) The result is that, of all offences committed by persons of color, the Superior and the District Court have concurrent jurisdiction; but of misdemeanors committed by white persons, the District Court alone has jurisdiction. This Court sees reason to regret that the Superior Court was not allowed to retain concurrent jurisdiction of all cases whereof jurisdiction has been given to the District Court, but it cannot doubt the competency of the Legislature, under the Constitution, to do all that it has done in the matter.
The motions are all dismissed.
DüNkiN, 0. J., Glover, J., Carroll, 0., Dstglis; A. J., Daweins, J., and JohksoN, 0., concurred.
LesesNe, C, Munro and Moses, JJ., dissented.'

Motions dismissed.

(a) Birney vs. Tax Collector, 2 Bail. 676 — Mr. Webster’s argument; Dartmouth College vs. Woodward, 4 Wheat. 580. 2 Reave’s Hist, of the English law, 442: note.

(b) Besides the cases cited in the margin, see State vs. S. W. Allen, 2 McC. 59; Dunn vs. City Council, Harp. State Rep. 199; Patrick & Manigault vs. Commissioners, 4 McC. 543; State vs. Dawson, 3 Hill. 103; State vs. Maxey, Arthur et al. 1 McMul. 502; State ex relat. Horlbeck vs. City Council, 12 Rich. 729.

(c) See Note b. Also, State vs. Huntington, 3 Brev. 111; The State ex relat. Jenkins vs. Commissioners, Cheves, 109; Commissioners vs. Trescot, 5 Rich. 278; The State ex relat. Price vs. Commissioners, 3 Hill, 314; State vs. Comm'rs Newtowncut, 2 Sp. 402, 2 Strob. 560, 3 Strob. 380; Crosby vs. Warren, 1 Rich. 385; Corporation of Columbia vs. Hunt, 5 Rich. 550.

(d) 1798, 7 Stat. 286, § 7; 1799, 7 Stat. 291, § 6; 1857, 12 Stat. 661; 1712, 2 Stat. 460; 1731, 3 Stat. 281, §§ 26, 223; 2 Stat. cited, 3 Bla. Com. 362; 1 W. & M. § 2, ch. 2, 1 Stat. 126, § 11; 1791, 7 Stat. 271, § 5; 1740, 3 Stat. 542, 630, 727; 4 Stat. 43, 397, 423, 477.

(e) 1841, 11 Stat. 154; 1865, 13 Stat. 282, § 15-17; 1866, 13 Stat. 494, § 7; 3 Stat. 728, § 1; 1778, 4 Stat. 424, §§ 2, 3.

(f) De mediat. ling., 1783, 4 Stat. 549; 1786, 4 Stat. 754; 1839, 11 Stat. 34, § 45. For special inquests, 1731, 3 Stat. 280, §§ 2, 23; 3 Stat. 728, § 1. Special juries struck, 1768, 7 Stat. 203, § 19; 1778, 4 Stat. 424, §§ 2, 3; 1791, 7 Stat. 271, § 1-4; 1796, 5 Stat. 282; 1797, 5 Stat. 305; 1798, 7 Stat. 286, §§ 7, 8; 1799, 7 Stat. 291, §§ 6, 7; 1839, 11 Stat. 34, § 46. For landlord and tenant, 1812, 5 Stat. 76; 1817, 6 Stat. 67; 1839, 11 Stat. 21, §§ 23, 34, 45. Possession of real estate, a subject always considered peculiarly fit for jury trial.

(g) 1731, 3 Stat. 274, 323, 542, 631, 727; 4 Stat. 478, 483; 5 Stat. 306; 7 Stat. 234, 286, 291, 317, 326, 329; 11 Stat. 74, 254.

(h) 1816, 6 Stat. 28; 1824, 6 Stat. 238; 1831, 6 Stat. 439; 1836, 6 Stat. 551; 1844, 11 Stat. 295; 1845, 11 Stat. 342; 1858, 12 Stat. 740

(i) Oath, 1797, 5 Stat. 308; Charleston, 3 Stat. 288; 7 Stat. 247; 6 Stat. 93. Sales, 1731, 3 Stat. 274, 729, § 4; 7 Stat. 203. Summoning, fines, &c.; see statutes in note g and 13 Stat. 33, 73. For extra Courts, 7 Stat. 317, 326, 329; 11 Stat. 74, 254