Nicholson, C. J.,
delivered the opinion of the Court.'
Park sued Myers before a Justice of the Peace of Greene county, to recover 86^- cents, which he had paid to Myers, the Tax Collector, as interest on his taxes, from November 1, 1874, until the 14th of June, 1875, the payment being made under protest. The Justice of the Peace gave judgment for Parks for 86J cents, and Myers appealed to the Circuit Court, where the case was submitted to the court on an agreed state of facts, when the court affirmed the judgment below.
*556 From this judgment Myers has appealed. The facts agreed on' were, that Park’s property was regularly assessed for taxation for 1874, at $24.75, that he failed to pay the tax until the 14th of June, 1875, when he tendered the amount assessed, to the Tax Collector, Myers. He refused to receive that amount in full of his taxes, but demanded interest from the 1st of November, 1874, amounting to 86J cents.' Park declined to pay the amount, but offered to pay 33 cents as interest on his assessed tax, from the passage of the act of March 23d, 1875, to the date of tender. This was refused by the Tax Collector, whereupon Parks paid the amount of his assessed tax and 86J cents as interest, under protest.
This case is intended to test the validity of the act of March 23d, 1875, entitled, “An act to extend the time in which to collect taxes assessed for the year 1874, and for the relief of the people.” The preamble to the act assigns as reasons for its passage, that owing to the failure of the crop of 1874, large numbers of the tax payers are not able to pay their taxes, support their families and make a crop; and because it would not be wise or just to crush the people by cutting off production; therefore it is enacted:
“Sec. 1. That all persons be allowed until the 15th of November, 1875, to pay their taxes due for the year 1874, and that until that time, no penalty shall attach by reason of failure to pay the same before that time.”
“Sec. 2. That until the 15th of November, 1875, *557 there shall be no distraint or sale of personal or real property for unpaid taxes for 1874.”
The legal effect of these two sections, is to postpone the forced payment of taxes until November. 15th, 1875, and to suspend, during that time, the penalty assessed by the act of 1873, c. 118, s. 57, to the failure to pay taxes when due: This was a penalty of 10 per cent, or 12 per cent on the amount of taxes, according to circumstances stated in the act.
But sec. 3 proceeds to repeal secs. 52 and 57, and all other sections of chapter 118, passed March 22, 1873,. inconsistent with this act.
“Sec. 4. That in all cases where taxes for 1874, remain unpaid on the 15th of November, 1875, tax collectors shall proceed to distrain and sell,, etc.”
Sec. 5. The time and mode" of certifying land sales are stated.
Sec. 6. That the sureties of tax collectors shall acknowledge' their present, bonds, otherwise tax collectors to enter into new bonds. To this section is appended this proviso: “ however, that interest be collected from all the delinquents, at the rate of 6 per cent, per annum, from the date that such taxes were due.”
It is apparent upon the face of this act, that the original purpose was simply to postpone the enforcement of the taxes of 1874, and to suspend the penalty of 10 per cent, or 12 per cent, prescribed by the act of 1873, until the 15th of November, 1875. This is distinctly provided for by sections 1 and 2. The next purpose seems to have been to relieve the *558 tax payers altogether of the penalty prescribed by the act of 1873. This was done by the repeal of those sections of the act of 1873, prescribing the penalty for its enforcement. This object was accomplished by sec. 3. If the act had stopped here, the effect would have. been to. postpone the payment of taxes until November' 15th, 1875, and to release the penalty of 10 or 12 per cent, altogether.
But to avoid this result, the proviso to the 6th section was adopted, for the purpose of substituting interest on the taxes, from the time they were due until payment, instead of the penalty of 10 or 12 per' cent. The proviso, was therefore, a modification or limitation, not of the section to which it is annexed, but to the provisions of the preceding sections, and operates to substitute the interest in lieu of the penalties.
It appears that the Comptroller has fixed upon the 1st of November, 1874, as the time at which the taxes of that year are assumed to have been due, or from which time the interest is to be calculated. This makes the operation of the law uniform throughout the State, and under his power to prescribe uniform rules as to the collection of revenue, we see no ground to question its validity. It is clear, that if the Legislature had the power to annex 10 per cent, to the amount of taxes due, as a penalty upon all who failed to pay such taxes when due, they had the power to release the penalty fixed by the act of 1873, and to substitute a lower penalty, in the shape of interest at 6 per cent, from the time when the taxes were *559 due. That such was the intent and purpose of the Legislature we think obvious, on the face of the statute. In considering the question, whether the Legislature had the power to annex a penalty to the failure to pay taxes when due, and to enforce this penalty by the summary remedy of distraint, we must not overlook the distinction between the power of the Legislature, as limited and restricted by the Constitution, in regard to State dues, and those due from one citizen to another.
It was said by Justice Curtis, in the case of Murray’s Lessees v. Hoboken Land Improvement Co., 18 How., 282; “that probably there are few governments which do or can permit their claims for public taxes, either on the citizen or the officer employed for • their collection or disbursement, to become the subjects of judicial controversy, according to the course of the law of the land. Imperative necessity has forced a distinction between such claims and all others, which has sometimes been carried out by summary methods of proceeding, and sometimes by systems of fines and penalties, but always in some way observed and yielded to.”
The question, involved in the case in which these remarks were made, was, whether a distress warrant issued by the Solicitor of the Treasury was valid “process.” The warrant was authorized by an act of Congress, passed in. 1820. The objections to the validity of the warrant raised the question, whether, under the United States Constitution, a Collector of Customs, from whom a balance of account had been found to be due by account *560 ing officers of the Treasury, can be deprived of his liberty or property, in order to enforce payment of that balance, without the exercise of the judicial power of the. United States, and yet by “due process of law,” within the meaning of those terms in the Constitution; and if so, whether the warrant in question was such due process of law?
In discussing these questions, Justice Curtis refers to precedents furnished by the history of England, as to the mode of collecting claims due to the government, and says: “we apprehend there has been no’ period, since the establishment of the English Monarchy,' when there has not been, by the law of the land, a summary method for the recovery of debts due to the crown, and especially those due from receivers of revenue.”
He concludes that the methods of ascertaining and enforcing debts, found to be due to the government, have varied widely from the usual course of the common law on other subjects; and that, as respects such debts due from such officers, “the law of the land” authorized the employment of auditors, and an inquisition without notice, and a species of execution bearing a very close resemblance to what is termed a warrant of distress in the act of 1820, then in question.”
He adds; “ It is certain that this diversity in the law of the land,” between public defaulters and ordinary debtors, was understood in this country, and entered into the legislation of the Colonies and provinces, and more especially of the States, after the Decía *561 ration of Independence, and before the formation of the Constitution of the United States.”
Tested by the common and statute law of England, prior to the immigration of our ancestors, and by many of the States at the time of the adoption of the 5th amendment to the United States Constitution, the proceedings under the act of Congress of 1820, were held to be “ due process of law.” For though “due process of law” generally implies and includes ador, veus, judex, regular allegations, opportunity to answer,, and a trial according to some settled course of judicial proceedings, yet this is not universally true. There may be, and as we have seen, says Justice Curtis, there are cases, under the law of England after Magna Charta, as it was brought to this country and acted on here, in which process, in its nature final, issues against the body and goods of certain public debtors without any such trial.
The language of the 5th amendment of the United States Constitution is, that no person shall “ be deprived of life, liberty, or property, without due process of law.” The language of art. 1, sec. 8 of our Constitution is, that no man “ shall be deprived of his life, liberty, or property,' but by the judgment of his peers, or the law of the land.” Lord Coke, in his commentary on the words “law of the land,” says they mean “ due process of law ”: 2 Inst., 50.
Applying the decisions of the court, in the case from which we have been quoting, as to the true meaning of the words “ law of the land ” used in the Constitution, we must regard it as authority for *562 holding, that, our statutes which authorize the ascertainment of the amount of taxes due from each citizen, and the issuance of a distress warrant to enforce the same, against such as fail or refuse to pay the taxes assessed, are constitutional and valid.
The next question is, whether the Legislature has the power to annex to the failure to pay the taxes assessed, a penalty by way of enforcing the prompt payment? We have already seen by the authority in 18 How., referred to, that “ imperative necessity has forced a distinction between debts due to the government and all others, which has sometimes been carried out by summary methods of proceeding, and sometimes by a system of fines and penalties, but always in some way observed and yielded to.”
These are defined to be burdens or charges imposed by the legislative power upon persons or property, to raise money for public purposes. The power to tax rests .upon necessity, and is inherent in every sovereignty. It is so unlimited in force and so searching in extent, that the courts scarcely venture to declare that it is subject to any restrictions whatever, except such as rest in the discretion of the authority which exercises it: Cooley’s Lim., 479. This must be understood, however, as subject to such restrictions as may be imposed by the Constitution. We have seen that the enforcement of taxes by the summary method of distress warrant, is not in conflict with that provision of the Constitution, which secures persons and property from seizure or appropriation, but by “ the law of the land.” The power to annex pen *563 alties for the enforcement of the taxes assessed, is necessarily involved in the power to collect and impose taxes for public purposes. Without taxes governments can not exist. Hence, the power to tax is a necessity for self-preservation. But the power to impose taxes without the power to insure their prompt collection, would leave the government liable to be embarrassed in its operations by the delinquencies of tax payers. It follows that the Legislature must have the discretion, as to the mode of insuring prompt collections — this is as much a necessity as the power to tax. A penalty annexed to the failure to pay may be properly adopted, both as a means of inducing tax payers to be prompt, and as a means of protecting the State against loss by such failure to be prompt in payment.
But it is said, the Constitution requires taxes to be so imposed, that they shall be equal and uniform throughout the State; and that this provision is violated by annexing a penalty, whereby some pay more taxes than others, on property of the same value. The taxes imposed are equal and uniform as required, and the amounts required to be paid are uniform, as near as such a thing is practicable. Every tax payer has the right to discharge his liability to the State, by paying the amount assessed. If he fails to discharge his duty as prescribed by law, he thereby incurs the penalty, the additional amount he has to pay is not an additional tax imposed upon his property, but an amount imposed, as a punishment for failure to discharge his duty as a tax payer. He *564 does not pay more than his neighbor, who has been prompt, because he was taxed more than that neighbor, but because he has violated his duty. The taxes imposed are equal and uniform, notwithstanding some may incur the penalty, and thereby pay more than others. In the present case, the tax payer incurred the penalty prescribed by law, for failing to pay his taxes for • 1874, by the 1st of November, 1874, when they were due. He' then was legally liable to the penalty for his delinquency. But the Legislature has released him from that penalty, and required him in lieu thereof to pay a less penalty, to be ascertained by adding to the tax 6 per cent, per annum interest from the 1st of November, 1874. The additional amount required to be paid, is in the nature of a penalty, although called in the statute interest. It is a release of a larger penalty and an agreement that the tax payer may be discharged by paying a less penalty. It follows that the act in question is valid, and that the Circuit Judge erred in giving judgment against the collector.
The judgment will be reversed and judgment be given here against Park.