HON. ALANSON H. BARNES, 
HON. GRANVILLE G. BENNETT, } ASSOCIATE JUSTICES.

## THE PEOPLE v. SPONSLER.

*1.* *GAMBLING:* COMMON GAMBLER: INDICTABLE. The keeping of a common gaming house is indictable at common law, and a person, who for gambling purposes, keeps or exhibits any gambling tables, establishment, device or apparatus, is deemed a common gambler, and punishable as for a misdemeanor under the statutes of this Territory.

*2.* *STATUTES:* REPEAL: BY IMPLICATION. A subsequent statute inconsistent with or repugnant to a former one repeals it by implication; and when a reviving statute covers the whole subject-matter of antecedent statutes, it virtually repeals them without any express repealing clause.

*3.* ——: ——: PUNISHMENT CLAUSE. If a new statute provides a milder punishment than was before imposed for the same offense, it repeals so much of the old law as concerns the punishment.

*4.* *JUSTICES OF THE PEACE:* JURISDICTION: POWER OF LEGISLATURE. The Legislature of the Territory has no power under the Constitution of the United States, or the Organic act, to confer upon Justices of the Peace jurisdiction to try and punish offenses which are infamous or indictable at the common law.

*Writ of Error to the Yankton County District Court.*

THE facts necessary to an understanding of the points discussed and decided by the court, are sufficiently stated in the opinion.

*G. C. Moody,* for defendant.

*J. R. Gamble,* District Attorney, for the People.

SHANNON, C. J.—At the April term, 1876, of the District Court for Yankton county, the plaintiff in error was indicted for that on the 16th day of April, 1876, at the city of Yankton, in the county of Yankton, he did, for gambling purposes, unlawfully keep and exhibit a gambling table upon which to bet money, against the peace and dignity of the people of the Territory of Dakota, and contrary to the form of the statutes in such case made and provided.

He demurred to the indictment, and specified as the ground of objection thereto, that the said court had no jurisdiction of the subject-matter thereof. The demurrer was overruled, whereupon the defendant excepted and a bill was signed and filed.

Afterwards the defendant having elected not further to plead, but to stand upon his demurrer, moved the court to arrest the judgment, upon the ground—first, that the court had no jurisdiction over the subject of the indictment; second, that the facts stated in the indictment did not constitute a public offense.

The motion to arrest judgment was refused, and to this order the defendant excepted, and a bill was filed. Final judgment was then pronounced that the defendant pay a fine of one hundred dollars, and in default of payment be imprisoned.

The Penal Code contains a chapter of sixteen sections, upon the subject of " gaming." The first section of the chapter (being section 385 of the Code) declares that " it is unlawful to maintain or keep any table, cards, dice, or any other article or apparatus whatever, useful or intended to be used in playing any game of cards or faro, or other game of chance, upon which money is usually wagered, at either of the following places."

Here follows, in four subdivisions, a specification of the places and buildings. The next section (386) declares that " every person who knowingly violates the last section is guilty of a misdemeanor."

Section 387 prescribes that " every article or apparatus maintained or kept in violation of section 385, is a common and public nuisance."

Passing over the intervening sections as not particularly important to the present inquiry, we come to the consideration of section 393. This long section when analyzed according to its disjunctives, as to its first clause, will read thus—"every person who, for gambling purposes, keeps or exhibits any gambling table, establishment, device or apparatus, * * * * is deemed a common gambler, and is punishable as for a misdemeanor."

Section 394 authorizes the seizure of any such table or apparatus, found in the possession of the person arrested, and enjoins it to be delivered to the magistrate, who (by the next section) may either cause it to be destroyed, or may deliver it to the district attorney.

Section 396 requires the district attorney, in this latter event, and upon conviction of the accused, to cause the gambling apparatus to be destroyed.

By section 398 it is made "the duty of all sheriffs, police officers, constables, and prosecuting or district attorneys, to inform against and prosecute all persons whom they have credible reason to believe are offenders against the provisions of this chapter; and any omission so to do is punishable by a fine not exceeding five hundred dollars." (Penal Code of January 11, 1865.)

At this point it may be observed that the keeping of a common gaming house was indictable at the common law. In the *People v. Jackson*, 3 Denio, 101, Bronson, C. J., said—"I have no doubt that the keeping of a common gaming house is indictable at the common law." (See, also, the *People v. Sergeant*, 8 Cowen, 140.)

In 1 Russ. on Crimes, 299, it is said that gaming houses are nuisances in the eye of the law, being detrimental to the public, as they promote cheating and other corrupt practices. Again in 1 Russ., 318 to 325, disorderly inns, bawdy houses, and common gaming houses, are ranked among nuisances.

In Bishop on Statutory Crimes, section 546, in relation to nuisances at the common law, it is said (quoting from Gabbett) that " all disorderly inns or ale houses, bawdy houses, gaming houses * * * and the like are public nuisances,

either by reason of their endangering the public peace, or as they affect public morals, or, perhaps, as being productive of idleness, or attended with public inconvenience."

Again, the keeping of a common gaming house is indictable at common law, on account of its tendency to bring together disorderly persons, to promote immorality, and to lead to breaches of the peace. (*United States v. Ismenard*, 1 Cr. C. C., 150; *United States v. Dixon*, 4 ibid, 107; *United States v. Milburn*, 4 ibid, 719; *United States v. Ringgold*, 5 ibid, 378; *United States v. Milburn*, 5 ibid, 390.)

Most of modern criminal statutes either confirm or enlarge common law offenses. It would seem that sections 385 and 392 of our Penal Code, in connection with sections 395 and 396, are, in substance, declaratory of the common law; whilst section 393, with what follows, is merely an enlargement of the common law offense. For, to repeat, if a person, for gambling purposes, keeps or exhibits any gambling table, he is deemed a common gambler—which is a conclusion of law— and he is punishable as for a misdemeanor. What next follows? The gambling table must, if seized, be totally abated by its destruction, in the same manner in which any public nuisance may be abated. (See on this point sections 1956, 1959 and 1960 of the Civil Code.)

But however all this may be, it is contended by the plaintiff in error that section 393 of the Penal Code of January, 1865, in relation to "gaming," has been impliedly repealed by the statute of January 10, 1873, it being "An act concerning gambling," because the new law covers all possible cases that could occur under the old law.

Let us examine the new enactment. It declares "that it shall be unlawful for any person or persons to keep or exhibit any table or gambling apparatus of any kind or description, on which to bet money or property of any kind, in the Territory of Dakota."

But the first clause of the old statute is almost identically the same. It makes it unlawful for every person to keep or exhibit any gambling tabling, establishment, device, or apparatus; but with more fairness and precision, it has the additional words "for gambling purposes."

The superadded words of the new law, to-wit: " on which to bet money or property of any kind," do not give more clearness or strength than the other words " for gambling purposes." The former expression, indeed, rather tends to becloud the sense than to afford lucidity.

Section one, therefore, of the new law is but an awkward paraphrase of the first clause of section 393 of the old Code. The two enactments do not antagonize. They convey the same substantial meaning.

But there are other important clauses in section 393. The second one relates chiefly to faro. 'It runs thus: Every person who " is guilty of dealing 'faro' or banking for others to deal 'faro' or acting as 'lookout' or gamekeeper for the game of 'faro,' or any other banking game where money or property is dependent upon the result, * * * * is deemed a common gambler, and is punishable as for a misdemeanor."

The third clause is in regard to a different subject. It reads thus: Every person " who sells or vends what are commonly called lottery policies, or any writing, card, paper or document in the nature of a bet, wager, or insurance upon the drawing or drawn numbers of any public or private lottery, or indorses a book or any other document for the purpose of enabling others to sell or vend lottery policies, is deemed a common gambler, and is punishable as for a misdemeanor."

With this accurate analysis in view, what is there, then, in section one, or in any other part of the new statute, that comes in conflict with section 393 of the Penal Code? It is quite true that a subsequent statute inconsistent with or repugnant to a former one, repeals it by implication; and that when a revising statute covers the whole subject-matter of antecedent statutes, it virtually repeals them, without any express repealing clause.

In *U. S. v. Tynen*, 11 Wallace, 88, it was held that a subsequent statute on the same subject, which embraces all the provisions of a former one, and also new provisions, and imposes different or additional penalties, operates as a repeal of the former act, without any repealing clause.

But a statute is not repealed by a subsequent one, unless the latter use apt and appropriate words for that purpose; or unless there be such a direct and absolute repugnancy between them, that both cannot stand together.

This new act, section six, merely repeals all acts and parts of acts in conflict with it. Everything else in the Penal Code must stand, and what remains must be construed together.

The punishment under the Code for keeping and exhibiting a gambling table, for gambling purposes, was by imprisonment in a county jail not exceeding one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment.

The punishment under the new act is by imprisonment in the county jail for not less than five nor more than twenty days, or by fine not less than fifteen nor more than one hundred dollars, to which is added a forfeiture of all furniture or movable apparatus within the establishment.

It is clear that if a new statute provides a milder punishment than was before imposed for the same offense, it repeals so much of the old law as concerns the punishment.

It follows, therefore, that whilst the punishment is altered, section one of the act of January 10, 1873, is but a general, substantial enunciation or confirmation of the old law as contained in the first clause of section 393—the two enactments being almost identical, and bearing the same meaning; whilst the other clauses of that section remain intact and unrepealed.

The next inquiry is: do the facts stated in the indictment constitute a public offense? By section 221 of the Code of Criminal Procedure it is provided that "words used in a statute to define a public offense need not be strictly pursued in the indictment; but other words conveying the same meaning may be used." Other requisites to an indictment are, a statement of the acts constituting the offense, in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended; and that the act charged as the offense, be stated with such a degree of certainty, as to enable the court to pronounce judgment upon a conviction, according to the right of the case. (§§ 214, 222, Code of Criminal Procedure.)

Another important section (223) is, that no indictment is insufficient, nor can the trial, judgment, or other proceedings thereon be affected, by reason of a defect or imperfection in matter of form, which does not tend to the prejudice of the substantial rights of the defendant upon the merits.

Measured by these standards, how is it with the present case? The words used in the old statute to define this offense are: every person who, for gambling purposes, keeps or exhibits any gambling table, or establishment, or device, or apparatus, is deemed a common gambler (a presumption of law) and is punishable, etc.

In the new statute, the offense is defined in the following words: "It shall be unlawful for any person to keep or exhibit any table or gambling apparatus of any kind or description, on which to bet money or property of any kind."

The substantial definition, or gravamen, of the offense is, the keeping or exhibiting of any gambling table or apparatus, for gambling purposes—that is to say, on which to bet money or property. A glance at the indictment will suffice to show that it is good and sufficient under our Code. It possesses all the requirements; and the facts therein stated do constitute a public offense.

Upon what appears to be so plain a subject, it is not necessary to quote authorities, although numerous ones in point might be adduced.

The final inquiry is as to the jurisdiction of the District Court, which is controverted upon the ground of an Act approved January 10, 1873, entitled " An act to define the jurisdiction of the courts of justices of the peace," it being chapter 27 of the laws of 1872–3. It is as follows: " The justices' " courts of this Territory shall have *exclusive jurisdiction* of " all misdemeanors committed in their respective counties, " where the maximum punishment fixed by law does not ex- " ceed a fine of one hundred dollars, or imprisonment in the " county jail for a period of thirty days, or both such fine " and imprisonment; also, of all offenses under the laws of " this Territory, where the penalty is not specially provided " for." The second section repeals all acts or parts of acts in conflict with the provisions of that statute.

This singular and anomalous legislation in a Territory of the United States, might be dismissed with a few observations. Suppose they had, at the same session, reduced the punishment in all cases of misdemeanors (as was done as to gambling) to a fine not exceeding one hundred dollars or to imprisonment not exceeding thirty days, what would be the result as now contended for? Why, simply, that each justice of the peace would thereby have, in the language of this act, exclusive jurisdiction over all misdemeanors, thus depriving the accused of rights and privileges guaranteed to them by the Constitution of the United States. And if the assembly might reduce, in this way, the punishments attached to all misdemeanors, what is to hinder them from attempting to reduce felonies to misdemeanors, under the plea of economy, or for any other reason?

It would seem, however, that this piece of improvident legislation was almost copied from the Constitution of the neighboring State of Iowa, which, in section 11, article 1, declares that " all offenses less than felony, and in which the punishment does not exceed a fine of one hundred dollars, or imprisonment for thirty days, shall be tried summarily before a justice of the peace," etc. But it must be remembered that we are not a State, but a Territory. Our Constitution is that of the United States. Neither our Legislative Assembly nor our courts can contravene its mandates. An enactment contrary to its provisions, has no value or binding force. It enjoins that the trial of all crimes, except in cases of impeachment, shall be by jury; and this embraces all those crimes which, by former laws and customs, had been tried by jury. Article VI of the amendments, prescribes that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury; and this, also, was intended to embrace all those crimes and misdemeanors which by our former laws and customs had been tried by jury. Article V of the amendments provides that no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the

militia when in actual service, in time of war or public danger. It follows from this, that no one can be put upon trial for such crimes as thus named, unless on a presentment or indictment of a grand jury.

By the legal phrase " infamous crime" was intended a crime which worked infamy and dishonor in one who had committed it, and which rendered the infamous person incompetent as a witness, considering him too corrupt, morally, to testify. As crimes that were at the time considered infamous the following may be specified, to-wit: treason, felony, all offenses founded in fraud and which come within the general idea of the *crimen falsi*, as perjury, subornation of perjury, forgery, swindling, cheating,—barratry, suppression of testimony by bribery, conspiracy to procure the absence of a witness—petit as well as grand larceny, receiving stolen goods, etc. It was not the punishment but the crime that rendered the person infamous. (Bishop Cr. Law. 744.)

In *Duffy v. People*, 6 Hill, 77, the Chancellor says that the crime of petit larceny was always considered infamous. The Constitution of New York, however, expressly excepts petit larceny in that article which requires an indictment for capital and infamous crimes. (1 Wright, 142; Willes R., 665; 6 Hill, 75.)

Certainly, with regard to the above offenses there must be, in a Territory, a grand jury to present or to indict the accused party.

Another clause in article V of the amendments, declares that no person shall be " deprived of life, liberty, or property, without due process of law." In the Ordinance of 1787, which is the model of our Territorial governments, it was declared that the inhabitants should always be entitled to the benefit of trial by jury, and of judicial proceedings *according to the course of the common law;* and that no man should be deprived of his liberty or property but by the judgment of his peers, or the law of the land.

Our own Organic act declares that the legislative power of the Territory shall extend to all rightful subjects of legislation consistent with the Constitution of the United States and

the provisions of that act; and that the Supreme and District Courts shall possess *common law* jurisdiction and authority for redress of all wrongs committed against the Constitution or laws of the United States, or of the Territory, affecting persons or property.

What is meant by the words " due process of law?" The Supreme Court of the United States, in *Murray's Lessee v. Hoboken Land Co.*, 18 *How.*, 276, held that these words were undoubtedly intended to convey the same meaning as the words, " by the law of the land," in *Magna Charta.* In a part of the 29th chapter of Magna Charta it was declared that no freeman shall be taken, or imprisoned, or be disseized of his freehold, etc., but by lawful judgment of his peers, or by the law of the land. Coke in his commenting upon this statute says that these words " by the due course and process of law," which he afterwards explains to be " by indictment or presentment of good and lawful men, where such deeds be done in due manner, or by writ original of the common law." (2 Inst., 45, 50.) Story says that this clause in our amended Constitution, " in effect affirms the right of trial according to the process and proceedings of the common law." (2 Story on Const., § 1789, third edition; see also Kent's Comm., Vol. 1, page 612.) The meaning, therefore, of this phrase is that no person shall be deprived either of life, or of liberty, or of property, unless the matter shall be adjudged against him upon trial and according to the course of the common law. It will thus be seen that the same measure of protection against legislative encroachment, is extended to life, liberty, and property. As to all of them, the prosecution or suit must be instituted and conducted according to the prescribed forms and solemnities for ascertaining guilt or determining the title to property.

Statutes which would deprive a citizen of the rights of person or property, without a regular trial according to the course and usage of the common law, would not be either " the law of the land," or " due process of law."

There is, however, another mode of prosecution, which exists by the common law in regard to the grade of common

misdemeanors; though these also were ordinarily prosecuted upon indictments found by a grand jury. This species of proceeding was, in England at the suit of the King, without a previous indictment or presentment, and was termed *an information*. It was a complaint or accusation in writing exhibited against a person for some misdemeanor, and differed in no respect from an indictment in its form and substance, except that it was filed in the court of King's bench, at the mere discretion of the proper law-officer of the government *ex-officio*. The oppressive use of this mode of prosecution in England, occasioned struggles to procure a declaration of its illegality. But in the court of King's bench, all the Judges were clearly of the opinion that this proceeding was grounded on the common law, and could not be then impeached. A few years after that decision, *informations* were so restricted by act of parliament (4 and 5 W. and Mc., 18) that the law-officer should not file them without express leave from the court; and that every prosecutor, permitted to promote such information, should give security to prosecute the same with effect, and to pay costs to the defendant, in case of his acquittal, unless the Judge should certify there was reasonable cause for filing it. (4 Blackstone's Comm., 308.) But in 1 Bla. Rep., 542, it was said, that the court would always take into consideration the whole circumstances of the charge, before they would lend their sanction to this extraordinary mode of prosecution.

Mr. Justice Story (in Story on Const., Vol. 2, 1786) remarks, that "this process is rarely recurred to in America, and it " has never yet been formally put into operation by any pos- " itive authority of Congress, under the national government " in mere cases of misdemeanors, though common enough in " civil prosecutions for penalties and forfeitures."

Congress, however, by act of May 31, 1870, did in part act on the subject, but merely as to offenses against the elective franchise. And now by section 1022 of Revised Statutes of United States, it is provided that " all crimes and offenses, " committed against the provisions of chapter seven, title " 'crimes,' which are not infamous, may be prosecuted either

" by indictment or by information filed by a district attorney." An election of remedies is thus given to the law-officer, as at common law; and so by the Revised Statutes of Colorado, of the year 1868, section 134 of Criminal Code, the district attorney of any county may elect to proceed by information or indictment, in cases of gambling. (See *Chase v. The People*, 2 Colorado R., 509.) And, of course, the *information* at common law, was always triable in the court, by a petit jury, and never before a justice of the peace.

Recurring to article V of the amendments to the Constitution, whilst for capital or otherwise infamous crimes there must be presentment or indictment by a grand jury, yet, for crimes less than *infamous*, it would seem that mere information according to the course of the common law, would suffice. (See 2 Abb. U. S. Prac., 177.)

With these observations tending to point out the caution and care which should be practiced in our legislation, there is little to add concerning the statute in controversy—that of January 10, 1873, defining the jurisdiction of justices' courts— except that it must be noticed there is a later law—that of January, 1875—by which it is positively declared that the District Court has jurisdiction to inquire, by the intervention of a grand jury, of *all public offenses* committed or triable in the county or subdivision for which the court may be held. (Code Cr. Prac., § 17.) And by section 184 of same Code, it is also declared that the grand jury has power, and it is their duty, to inquire into *all* public offenses committed or triable in the county or subdivision, and to present them to the court, either by presentment or indictment.

In view of these fresh enactments, and aside from all other matters referred to, if the act in question ever was, in any degree, valid, and if it ever conferred exclusive jurisdiction, it must now be considered as having, at least, lost the feature of exclusiveness. And this is made plainer by section 19 of the new Code, which defines the jurisdiction of justices of the peace. Apart from their duties as mere committing magistrates, they may exercise such lawful original jurisdiction, under the Organic act, as is now or may hereafter be conferred on them.

The burden of the complaint of the plaintiff in error, is, that he has been wronged because, under the mode pursued in his case, it required at least twelve citizens under their oaths to accuse him before he was called on to answer; and because he had the opportunity thereafter of a full panel of petit jurors from which to select his triers. He claims that he ought not to have had these privileges and benefits; that it was unlawful to accord them to him; and that he should have been accused by one man only, and tried before a justice of the peace.

But as no justice of the peace ever took cognizance of the case, there is nothing in the Code to hinder or prevent the grand jury from pursuing the line of duty imposed on them by their oaths [section 178] in regard to this public offense; and there is consequently nothing in said act of 1873 to oust the jurisdiction asserted by the District Court, to try the indictment when found.

There being no error in the record, or in the rulings of the court below, the judgment is affirmed; and it is ordered that the proceedings herein be remitted to the District Court of Yankton county, to enforce the original judgment.

All the Justices concur.