**MORRISANIA COMMUNITY CORP.**
**et al., Plaintiffs,**

v.

**Curtis W. TARR, National Director of the**
**Selective Service System et al.,**
**Defendants.**

**No. 71 Civ. 2569.**

United States District Court,
S. D. New York.

Aug. 9, 1971.

Levy, Gutman, Goldberg & Kaplan, New York City, for plaintiffs; Jeremiah S. Gutman, Donald L. Doernberg, New York City, of counsel.

Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y., for defendants; Stanley H. Wallenstein, Asst. U. S. Atty., of counsel.

## OPINION

FRANKEL, District Judge.

The chief and least bearable costs of war are paid in human lives. The young doctors who bring this suit, together with the communities they serve, present one aspect of that reckoning. It is claimed that plaintiff physicians and their "class," unquestionably subject to statutory draft obligations, must be deferred because of assertedly gross flaws in the standards and procedures for allocating scarce medical personnel in places of civilian as against military need. A preliminary injunction is sought which would have the effect of blocking the draft of unwilling doctors and erasing even the allegedly inadequate procedures by which allocations are now made. The court concludes that threshold jurisdictional obstacles and the likelihood that plaintiffs will fail on the merits compel denial of their motion for a preliminary restraint.

### I.

The original plaintiffs, offering themselves as representatives of two classes (draft-eligible physicians and the community in which they work), are two physicians, Dr. Marc Greenwald and Dr. Andrew Rosenblatt, two public service corporations concerned, *inter alia*, with health care and facilities in the Bronx, a State Senator, and the executive director of one of the plaintiff corporations. Defendants are Selective Service officials: the National Director, two local draft boards, the Medical Advisory Committee for New York City and the National Selective Service Medical Advisory Committee.[1] Other physicians have been allowed to intervene since the suit began. However, most of them have actually been deferred or found unfit for military service in the weeks of the pendency of the case, and it appears now that only plaintiff Rosenblatt and two intervenors among those suing face probable induction. Deferments of the others have been granted on the advice of the Medical Advisory Committee, which is the main target of the action. While that bears upon the propriety of allowing this to proceed as a class suit, it is not vital for the other issues now to be considered. At the same time, to avoid superfluous detail, it will be sufficient to outline the pertinent facts in terms of Drs. Rosenblatt and Greenwald without the others.

Dr. Rosenblatt is 25 years old. He registered for the draft, as did other youths of his age, in 1964. He was thereafter deferred continuously as a student until June of 1970, allowing him to complete undergraduate and medical school. He proceeded then to serve as an intern in medicine at the Bronx Municipal Hospital Center from July 1, 1970, to June 30, 1971. On July 20, 1970, he was reclassified 1–A, available for military service. He was duly informed of, but chose not to exercise, his right of personal appearance before his Local Board or the State Appeal Board. He was examined and found fit for service

---

[1]. Strictly speaking, the last defendant appears to be slightly misnamed, but this is of no importance. For neatness, however, the agency intended appears to be named, since 1968, the combined "National Health Resources Advisory Committee and National Advisory Committee to the Selective Service System," hereinafter "NHRAC."

on September 24, 1970. On March 19, 1971, the Local Board mailed him an order to report for induction on July 1, 1971, a date that allowed for completion of his internship. There followed the efforts, detailed below, to obtain his deferment, culminating in the present lawsuit.

Plaintiff Greenwald is Rosenblatt's contemporary and has a biography similar in respects pertinent here. As has been noted, however, despite his joinder here, he has lately been deferred following a finding of essentiality by the Medical Advisory Committee, which reached a different advisory opinion in the case of Rosenblatt.

To focus, then, on Rosenblatt, after the notice of March 19, ordering his induction on July 1, 1971, his Local Board received three letters from hospital officials and one from Congressman Badillo. These reported that Dr. Rosenblatt's internship was scheduled to be followed by a residency beginning July 1, 1971. The letters urged a vital community need for his continued services and said he would be difficult to replace because of a shortage of physicians in the Bronx. The Board postponed the induction pending receipt of a recommendation from the Medical Advisory Committee, the nature and functions of which are outlined below. Dr. Rosenblatt's file was forwarded to that Committee through State Selective Service Headquarters. The New York City Medical Advisory Committee—or, more precisely, its Bronx subcommittee, consisting currently of one physician—concluded and advised on April 27, 1971, that Dr. Rosenblatt should not be considered so essential where he is as to warrant deferment. While that recommendation was not yet finally adopted by the Local Board when this suit was brought, the court treats Dr. Rosenblatt,

seemingly alone among the physicians appearing as plaintiffs, as sufficiently aggrieved or threatened to be suing.[2]

Some brief description becomes appropriate—though we find remarkably little in plaintiffs' papers—of the scheme for drafting and deferring doctors. We start, and may ultimately end, with undisputed statutory authority for such a draft. The starting-point is, of course, a universal obligation of males 18 to 26 years old to register for the draft, as Dr. Rosenblatt did when he was 18, 50 U.S.C.App. § 453. Omitting numerous details, we have, then, a system of deferments for those training for careers in medicine, balanced, as it were, by a Doctors Draft Act, 64 Stat. 826, which in its present form provides in pertinent part for draft liability of such men extending to age 35, 50 U.S.C.App. § 456(a) (1). Another significant factor in striking the balance is that the young man pursuing a career in medicine is not only deferred for his years of study, but is fairly well assured that his military duties will be in the area of his profession, unlike the situation of most other draftees. Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). There is no statutory right of a man like Dr. Rosenblatt to be deferred because he is urgently wanted in some civilian post. In addition, there is no statutory right in any community or place to have such deferments, although the Executive, evidently responsive to Congressional pressure,[3] has acted to mitigate the most severe of local hardships.

Plaintiffs do refer to one subsection of the draft law as supportive of their position. This does not constitute a statutory ground for deferring any physician. But it is a statutory starting-place for discussion of the problems in the case. 50 U.S.C.App. § 454(j) provides for establishment by the President

---

2. Among other things bypassed to reach this posture is the pendency of a new deferment request by Dr. Rosenblatt, this on the ground of his being a graduate student. Also, as is evident from the date of this writing, his induction has been postponed beyond July 1 to allow for final action on his still open claims for deferment.

3. 3 Sel.Serv.L.R. 74 (March 1971).

of "a National Advisory Committee which shall advise the Selective Service System and shall coordinate the work of such State and local volunteer advisory committees as may be established to cooperate with the National Advisory Committee, with respect to the selection of needed medical and dental and allied specialist categories of persons." The Committee is to be comprised of people "outstanding in medicine, dentistry, and the sciences allied thereto * * *." The national, state and local committees are directed by the statute to "give appropriate consideration to the respective needs of the Armed Forces and of the civilian population for the services of medical * * * personnel; and, in determining the medical * * * personnel available to serve the needs of any community, such committees shall give appropriate consideration to the availability in such community of medical * * * personnel who have attained the thirty-fifth anniversary of their birth." The committees are "to make determinations with respect to persons in residency training programs who shall be recommended for deferment for the purpose of completing such residency programs, and in making such determinations shall give appropriate consideration to the respective needs of the Armed Forces and the civilian population."

In a statutory framework that is not questioned or seemingly open to question in this case, Congress made occupational deferments, including those for medical specialists, a matter for executive judgments from time to time. See 50 U.S.C. App. §§ 454(g) and 456(h); Breen v. Selective Service Local Board No. 16, 396 U.S. 460, 465, and id. n. 5, 90 S.Ct. 661, 24 L.Ed.2d 653 (1970). The fundamental determinations are made on the basis of advice from the National Security Council to the Director of Selective Service. To go only to the recent background of the instant case, it appears that in February of 1968, the Security Council advised the Director, who adopted the advice, that deferments "based on the lists of essential activities and critical occupations should be suspended." Among the considerations underlying this advice, in addition to an overall appraisal of both civilian and military needs, was:

"The inherent inequity, at a time when men are called upon to risk their lives for the Nation, in any such occupational deferments from military service which may in practice turn into permanent exemptions." [4]

Cf. Boyd v. Clark, 287 F.Supp. 561 (S.D.N.Y. 3-judge court 1968), affirmed, 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969). Similarly, in limiting severely the deferments available to graduate students, the Security Council acted upon the joint judgment of the Secretaries of Health, Education, and Welfare (Gardner), Labor (Wirtz) and Commerce (Trowbridge) that extension of such privileges beyond stringent limits "is unfair to the thousands of other young men, who lack the social and economic advantages to pursue graduate study." [5] Such notions of fairness—suggesting that occupational or educational deferment is for public needs appraised nationally, not for the individuals who may happen to be deferred as a result— are among the basic policies in the background of this case.

Against that background, the National Security Council, in April of this year, advised the Director of the Selective Service System that procedures should be instituted to grant "deferments for medical and allied specialists subject to special induction calls * * *." [6] This stemmed from the conclusion of the NHRAC "that a civilian need exists to

---

4. Memorandum of Advice Respecting Occupational and Graduate Student Deferments, National Security Council, Feb. 15, 1968.

5. Memorandum for the National Security Council Department of Labor, Department of Commerce, Department of Health, Education and Welfare, Feb. 14, 1968.

6. Memorandum of Advice from Henry A. Kissinger dated April 23, 1971.

defer certain doctors who are essential to and irreplaceable in their communities."[7] Agreeing with this view, the Security Council stressed at the same time "that the critical needs of the Armed Forces in this time of strife are equally compelling and cannot be allowed to suffer with the implementation of this advice."[8]

Acting upon the advice of the Security Council, the Director of Selective Service, on April 26, 1971, instructed his State Directors to reopen and reconsider claims for deferments of physicians based upon "community essentiality." His letter on this subject advised that a physician "may be considered as essential in the community only if he is directly involved in patient care and his removal from the community would result in an extreme shortage of an especially critical community service where a replacement cannot be found by the community involved in the time allotted by a postponement of induction." He stressed too, with underscoring, that it is "vital that each state fill its call and that the Selective Service System meet the schedule provided by the Department of Defense for bringing special registrants to active duty."

Transmitting these determinations and basic policies to the State Medical Advisory Committees, the NHRAC Chairman, on April 30, 1971, suggested "that in determining community essentiality the following considerations may be useful:

"1) The availability of physicians and allied specialists in sparsely settled communities or other areas where essential health services are critically short (e. g., remote rural communities or ghettos).

"2) The necessity of continuing the provision of essential outpatient and inpatient medical and health services to a community (e. g., where the withdrawal of residents or house staff of a community hospital would force the elimination of a critically important professional service to members of the community served by that hospital).

"Communities and institutions should be admonished to make strenuous and continuing efforts to obtain needed medical and health professional coverage from among individuals in the following categories:

"1) Those not eligible for induction (e. g., prior service, physically unqualified).

"2) Women.

"3) Professionals over 35 years of age."

It was in this setting that the claims of the plaintiffs herein came to be considered by the New York City Medical Advisory Committee, and, specifically, by the single-member subcommittee for the Bronx.[9]

As evidenced by the instant case, requests for deferments of doctors are made by the registrant, his employer, or both, and the knowledgeable people making such requests submit pertinent data, arguments and reasoning, commonly accompanied by letters from elected officials and community organizations. A form letter invites the registrant to submit items of information that may have been omitted. The materials are then sent to the appropriate subcommittee of the Medical Advisory Committee.

The subcommittee for the Bronx has at the moment only one member, Dr. Abraham J. Fleischer, who performs this function without pay. Dr. Fleischer has lived in the Bronx for 48 years, for 46 of which he has also practiced medicine there. Among his other, extensive medical credentials, he is a former President of the Bronx County Medical

7. *Id.*

8. *Id.*

9. It appears, by the way, that well over half the requests for deferment of the kind here in question have been the subjects of favorable recommendations in New York City. The percentage for the Bronx is said to run between 60 and 80.

Society, a former President of the Gynecological and Obstetrical Society of the Bronx, and a former Navy Medical Officer. He states in an affidavit, with evident basis, that after living in the Bronx for so many years, he is "keenly sensitive to the needs of the community, particularly in [his] chosen profession, and * * * acutely aware that in the past few years the hospitals in the Bronx have become understaffed and that fewer doctors are desirous of serving in the Bronx." He points out that before making a recommendation he reviews all information submitted by the registrant, his employer, community groups or other interested parties. Then, he says:

> "Upon receipt of this information the question of essentiality will be considered in light of my knowledge of the particular hospital and its requirements, and those of the community it serves, giving due regard to the particular talents of the doctor in question, the extent of his training, i. e., whether an intern or a resident, and the staffing situation of the particular department served by the doctor. From time to time the Chiefs of the various hospital departments or the Dean of the Medical School affiliated with the hospital, will be contacted by me in order to obtain updated information on the needs of the hospital and/or the personal qualifications of the registrant.

> " * * * I am of the view that virtually all Bronx hospitals, municipal and otherwise, have in recent times, suffered an understaffing problem. Accordingly I can state that about 75% of the cases submitted to me in recent months have received a recommendation in favor of granting a deferment."

The complaint in this case attacks the foregoing procedure in several respects. It is said upon information and belief that "the Medical Advisory Committees make their decision as to the availability for induction of physicians * * * without hearing or receiving evidence concerning such physicians' availability

in light of the respective needs of the Armed Forces and the civilian population as required by § 454(j)." Likewise upon information and belief it is asserted that "the local Medical Advisory Committees do not allow the presentation of evidence as to physicians' essentiality by the physicians concerned, their hospitals, or the communities which they serve." Continuing, plaintiffs charge that there was for the affected physicians "no semblance or attempt to provide notice, opportunity to present evidence, opportunity to confront witnesses, opportunity to be present, right to counsel or any other aspect of due process of law * * *." Further, plaintiffs charge, publicly supported hospitals, overburdened by the needs of the poor, are disproportionately depleted by the draft, depriving those in the communities they serve of equal protection and due process.

The prayer for relief asks a declaration that defendant Selective Service officials "acted illegally in soliciting, accepting and relying upon recommendations of the Medical Advisory Committees"; and that defendants have violated the rights of plaintiff doctors and the community. An injunction is sought against induction of plaintiffs Greenwald and Rosenblatt; against defendants' "requesting, receiving, soliciting, relying upon or otherwise having anything to do with recommendations from the Medical Advisory Committees concerning the availability or eligibility of plaintiffs GREENWALD and ROSENBLATT or the members of their class;" forbidding release of "confidential information from the Selective Service files of plaintiffs GREENWALD AND ROSENBLATT or the members of their class to the Medical Advisory Committees for the purpose of making such recommendations or for any other purpose whatsoever;" and canceling any outstanding induction orders to Greenwald or Rosenblatt.

## II.

Before dealing briefly with the merits, it is necessary and probably decisive,

to observe that the defendants seem destined to prevail, at least as the law now stands, in their contention that the court lacks jurisdiction of this action.

■ The basis for this defense is § 10(b) (3) of the Selective Service Act of 1967, 50 U.S.C.App. § 460(b) (3), which says:

"* * * No judicial review shall be made of the classification or processing of any registrant by local boards, appeal boards, or the President, except as a defense to a criminal prosecution instituted under section 12 of this Title, after the registrant has responded either affirmatively or negatively to an order to report for induction, or for civilian work in the case of a registrant determined to be opposed to participation in war in any form * * *."

In a sharply limited but still uncertainly defined exception to this literal barrier, it has been held that an order for induction may be reviewed prior to induction where the order is "basically" or "blatantly lawless," Oestereich v. Selective Service System Local Board No. 11, 393 U.S. 233, 237, 238, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968); Breen v. Selective Service Local Board No. 16, 396 U.S. 460, 90 S.Ct. 661, 24 L.Ed.2d 653 (1970). There is weight in the view that a registrant attacking the validity of the general procedure leading to his induction order should have a right to pre-induction review (see Harlan, J., concurring, in *Oestereich*, 393 U.S. at 239ff, 89 S.Ct. 414, and *Breen*, 396 U.S. at 468–469, 90 S.Ct. 661), and the plaintiffs here might come within such a test. But that position is not now the law, and these plaintiffs demonstrate nothing like the kind of clear or blatant lawlessness that could make their claims cognizable at this stage. Cf. Fein v. Selective Service System Local Bd. No. 7, 430 F.2d 376 (2d Cir. 1970), cert. granted, 401 U.S. 953, 91 S.Ct. 975, 28 L.Ed.2d 236 (1971). The *Fein* case, whatever may be its ultimate fate, is controlling here and leads *a fortiori* to

rejection of plaintiffs' jurisdictional arguments.

■ The plaintiffs representing the Bronx community propose a distinction. They and their class do not face induction, it is argued, and limiting them to post-induction review is, therefore, neither fair nor feasible. Whatever its surface plausibility, the suggested distinction evaporates upon scrutiny. The basic policies of the draft law postponing review until after induction are not less applicable because of the unique intervention of community people. After induction, as before, we may presume that the physicians involved would join in suits assailing their induction orders. Indeed, it would be at least incongruous to allow suits by the communities if the physicians themselves were absent—either too uninterested to seek return to civilian life or perhaps even desirous of serving at military posts instead. And, finally, assuming there could be legitimate grounds for seeking habeas corpus without the physicians themselves as suitors, there are familiar precedents for such forms of procedure. Cf., e. g., United States ex rel. Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955).

### III.

■ On the issue of jurisdiction it seems sufficient for plaintiffs' defeat that they have not shown "blatant lawlessness." It is also to be observed, however, if only briefly, that their claims on the merits do not seem meritorious enough to justify the kind of drastic relief now being sought.

The claim that the doctor draft disproportionately burdens ghetto communities is not cogently demonstrated by the limited collection of figures plaintiffs tender as "statistics." The court could nevertheless come close to noticing a probability that this contention is accurate. If it were—if it is—this could not justify enjoining the induction of Dr. Rosenblatt or anyone else. This is not the only subject, though it could be among the most poignant, on which na-

tional policies may bear in such unequal fashion. As has been indicated above, there has been at least a measure of executive action to mitigate the inequalities. Though much may remain to be done, this is clearly a matter for broad, national legislative judgment, not for the crude interventions of judges armed with constitutional generalities and the kind of random data and broad assertion tendered by the plaintiffs here.

Similar answers dispose of plaintiffs' attacks upon the state quotas ordered for induction of doctors. The quotas appear to have been designed to equalize the odds of being called as they touch each individual registrant. If not compulsory, this is surely a decent criterion. It may result, as plaintiffs say, in an unsuitable pattern of levies when judged by the areas of medical need rather than places of individual doctors' registration. Again, however, the courts are neither proper nor efficient instruments of improvement. The accidental impacts and horrors of war are far more pervasive than those plaintiffs present, and mostly not curable by litigation. Judges are as equipped to revise the doctor draft quotas as they are to decide which registrant should play in the military band and which other should be on patrol tonight. Cf. Orloff v. Willoughby, 345 U.S. 83, 94, 73 S.Ct. 534, 97 L.Ed. 842 (1953). The fact that we live currently with a lottery system as the fairest mode of draft selection (see Presidential Proclamation No. 3945, 34 Fed.Reg. 19017, Nov. 28, 1969) is stark evidence of the degree to which war and rational control of men's fate may subsist together. This is not to praise or to "legitimate" war or its regime of irrationality. It merely underscores some pertinent limits of the law's rationalities.

Plaintiffs' main complaint is against the procedures of the Medical Advisory Committees—the absence of hearings, confrontation, cross-examination.[10] The point, if it is ever reached, would appear to have weight. But it would also appear unlikely to succeed in the end. To begin with, there appears to be no constitutional or statutory requirement that "community needs" be assessed, compared, and accurately determined before issuing individual induction orders. Insofar as the problem has been recognized, it has been left, as it could constitutionally be left, for executive management. This does not mean, of course, that the Executive may be arbitrary or lawless. To take the easiest case, we may assume there would be an avenue to relief if, in the guise of serving community needs, draft officials actually judged invidiously on grounds of race or creed or politics.

Aside from such cases, however, the plaintiffs' due process arguments do not seem destined for ultimate success. The determination of community needs for medical services—and especially the weighing of communities against each other in a setting that many at least would characterize as generally exiguous —has the quality more of "legislative" than of adversarial, individual judgment. Whether or not that label fits precisely, neither Congress nor the Executive has ever indicated that litigable "rights" should arise from such determinations. There is no indication, certainly, that the individual doctor was meant as beneficiary of the effort to take account of community problems. And it was never suggested, or evidently anticipated, that the communities themselves would be entitled or expected to explore these problems in the unlikely procedures of adversary litigation.

When the Director of Selective Service ordered in April of this year that efforts should be made to ease the impact of the

10. Oddly, plaintiffs include among their prayers for relief a request that the draft officials be enjoined from giving any information whatever to the Advisory Committees and from relying upon the advice of the Committees. The result, not explained or rationalized in the papers, would presumably be to make impossible even the large numbers of deferments the Committees recommend or, perhaps, to paralyze the doctor draft altogether. Neither goal is justifiable on any legal basis plaintiffs have suggested.

doctor draft upon such places as "remote rural communities or ghettos," he also stressed that:

(1) "It is vital that each state fill its call;"

(2) pertinent recommendations for deferment "and any other information shall be obtained where warranted, in the most expeditious manner;" and

(3) a physician should be deferred as "essential in the community only if he is directly involved in patient care and his removal from the community would result in an extreme shortage of an especially critical community service where a replacement cannot be found by the community involved in the time allotted by a postponement of induction."

There was no suggestion that deferment applications should be decided upon live, adversary hearings with cross-examination and other trial accoutrements. The call for obtaining information "in the most expeditious manner" quite plainly conveyed a different implication. There was and is no provision for staff or other arrangements suited to adversary proceedings.

Due process would not seem to require more than the Director indicated. What due process may mean in any case is, of course, dependent upon the context and nature of the proceeding. As Mr. Justice Frankfurter recalled, concurring in Hannah v. Larche, 363 U.S. 420, 487–488, 80 S.Ct. 1502, 1543, 4 L.Ed. 2d 1307 (1960), the Supreme Court

"has been mindful of the manifold variety and perplexity of the tasks which the Constitution has vested in the legislative and executive branches of the Government by recognizing that what is unfair in one situation may be fair in another. Compare, for instance, Murray's Lessee v. Hoboken Land & Improvement Co., 18 How. 272, [15 L.Ed. 372] with Ng Fung Ho v. White, 259 U.S. 276, [42 S.Ct. 492, 66 L.Ed. 938] and see [Federal] Communications Comm. v. WJR, 337 U.S. 265, 275 [69 S.Ct. 1097, 1103, 93 L.Ed. 1353]. Whether the procedure now questioned offends 'the rudiments of fair play,' Chicago, M. & St. P. R. Co. v. Polt, 232 U.S. 165, 168, [34 S.Ct. 301, 58 L.Ed. 534] is not to be tested by loose generalities or sentiments abstractly appealing. The precise nature of the interest alleged to be adversely affected or of the freedom of action claimed to be curtailed, the manner in which this is to be done and the reasons for doing it, the balance of individual hurt and the justifying public good—these and such like are the considerations, avowed or implicit, that determine the judicial judgment when appeal is made to 'due process.' "

See also Camp v. United States, 413 F. 2d 419 (5th Cir. 1969) (no right to counsel in draft hearings); United States v. Morico, 415 F.2d 138 (2d Cir. 1969), vacated on other grounds, 399 U.S. 526, 90 S.Ct. 2230, 26 L.Ed.2d 776 (1970) (no need to have written findings in denial of conscientious objector applications). Cf. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Cafeteria and Restaurant Workers Union, Local 473 v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Escalera v. New York City Housing Authority, 425 F.2d 853 (2d Cir.), cert. denied, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970). The interests here affected, the rational means of identifying and weighing them, the broad field of inquiry, the need for expedition—all argue against plaintiffs' procedural claims. The court would incline to this conclusion even if plaintiffs' contentions were documented more precisely than they are. It is not correct to say, as plaintiffs do, that the Medical Advisory Committees act without "receiving" or "allowing" evidence. There is notice of the proposed inquiry;

it is triggered, in fact, by the registrant himself or his employer. There is no concrete suggestion in the papers of what other evidence Dr. Rosenblatt or the others could or would have submitted in more formal adversary proceedings. Aside from such things, and without pretending finally to rule on the question, the court rates as low the probability that plaintiffs will succeed on the merits of their claims.

This is not to suggest that the advisory subcommittee, even though it consists of only one uncompensated and possibly overworked physician, should not preferably explain its advice. Nor does it appear that the physicians, the hospitals and others are or should be precluded from showing to the local board that the subcommittee's advice is unsound, arbitrary (e. g., inexplicable in distinguishing one doctor from another) and properly to be rejected. Finally, of course, it may not hurt to stress that today's decision goes on the record made for a preliminary motion; what other things may appear later are not foretold now with certainty or foreclosed. With these caveats, the present prospects on the merits weigh against the preliminary relief plaintiffs seek.

### IV.

There is no point at this stage in ruling favorably upon plaintiffs' application to have their suit held maintainable as a class action. The community representatives named as plaintiffs speak adequately in their present posture for the position they press. As they say themselves, the induction procedure they assail, "if wrong for one, must be wrong for all." As for the physicians, it has been indicated already that only Dr. Rosenblatt and two intervenors may be affected. It is at least conceivable that other doctors could adduce facts or argument suggesting an occasion for some form of hearing in their particular cases.

Plaintiffs' motion is in all respects denied. So ordered.